**James GIESLER and Luke Coniglio (doing business as Central Park Company), Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Cross–Appellant.**

**Nos. 00–5031, 00–5032.**

United States Court of Appeals, Federal Circuit.

Nov. 13, 2000

William E. Gast, Gast & Forehand, P.C., of Omaha, Nebraska, argued for plaintiffs-appellants.

Patricia M. McCarthy, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With her on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director. Of counsel on the brief was Marlene M. Surrena, Attorney, Defense Supply Center Philadelphia, Office of Counsel, of Philadelphia, Pennsylvania.

Before MICHEL, LOURIE, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

This is a government contract case. James Giesler and Luke Coniglio, doing business as Central Park Company, appeal from the October 21, 1999 order of the United States Court of Federal Claims denying their motion for an award of attorney fees and costs, following the court's September 15, 1999 decision granting summary judgment that Central Park deserves rescission of its unperformed contract with the United States for the supply of mixed nuts. *Giesler v. United States,* 44 Fed. Cl. 737 (1999). The United States cross-appeals the court's decision to award the equitable remedy of rescission of the contract, which also defeated its counterclaim for excess reprocurement costs. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). Because the Court of Federal Claims erred in holding that Central Park's failure to read the specification referenced in the government solicitation as to the maximum allowable peanut content was an excusable misreading of the specification, and because the court erred in holding that the government had a duty to verify the correctness of documents submitted subsequent to the opening and verification of Central Park's bid and subsequent to the completion of the pre-award survey of its subcontractor, we reverse on the cross-appeal. Central Park's appeal is dismissed as moot, as Central Park is no longer the prevailing party. We remand

for entry of judgment in favor of the United States on its counterclaim.

## BACKGROUND

### A. Factual History

This case involves a contract between the Department of Defense and Central Park for the supply of mixed nuts. On January 17, 1995, the Defense Logistics Agency ("DLA") issued a solicitation for 8800 cases of canned shelled mixed nuts. The request for proposals ("RFP") contains the following description of the item to be procured:

NUTS. MIXED, SHELLED

W/ OR W/O PEANUTS, ROASTED, SALTED.

4 LB. NO. 10 SIZE CAN. CID A–A–20164

TYPE I OR II, STYLE 1

The RFP does not explain the meaning of "CID A–A–20164," which stands for a certain "Commercial Item Description" published by the Commerce Department. This particular code specifies a mixed nut composition containing not more than 10% peanuts by weight.

Central Park's President, James Giesler, gave the RFP to his broker, Farner Bocken Company. Farner Bocken, in turn, identified a nut supplier, Flavor House Products, Inc. On February 9, 1995, Central Park submitted a bid in response to the solicitation, offering to supply "Nuts, Mixed, Shelled," with reference to CID A–A–20164, at $53.49 per case to be delivered, and $53.15 per case to be picked up at the origin. Central Park's bid price, times 8800 cases of nuts, yields a total contract price of approximately $470,000. Central Park's bid was the lowest received by the government, with the next lowest bid at $60.00 per case. On February 23, 1995, because Central Park's price for items to be delivered was only slightly higher than for items to be received at origin, John DiBabbo, a government contract specialist, contacted Giesler and re-

quested him to verify Central Park's quoted prices. The same day, Giesler faxed DiBabbo a notice stating that the quoted prices were correct.

On March 8, 1995, Russell Kinney, a pre-award survey manager for the government, telephoned a Central Park employee, Doug Anderson, in reference to an upcoming inspection of Central Park and Flavor House. During the phone call, Anderson stated that he did not believe Central Park had a copy of the mixed nut specification. On March 9, 1995, Giesler phoned James Knopf, the Regional Sales Manager for Flavor House, to verify its price quote and its ability to perform the contract requirements. The same day, Knopf wrote Giesler a confirmatory letter, stating "[w]e understand all Government Specifications and welcome any Government visit for inspection."

On March 27, 1995, Robert Hansen, a government inspector, went to Flavor House to conduct a pre-award survey. Flavor House's Vice President of Sales and Marketing, Bill Mallis, led Hansen through the inspection tour. According to Mallis' later testimony, Hansen asked for "real specific information" regarding the "actual product specifications for the mixed nuts." Hansen apparently requested a written specification of Flavor House nuts from Mallis, but Mallis did not have one prepared to give to Hansen. The next day, Hansen filled out an inspection form, checking "YES" in the box asking whether "FIRM HAS AND/OR UNDERSTANDS ... SPECIFICATIONS." On March 29, 1995, Hansen received a facsimile transmission from Mallis, with the third page containing a written specification of the composition of Flavor House mixed nuts. The header of the page reads: "Product: Oil Roasted Regular Mixed Nuts (60% Peanuts)." [A331] Further down the page, the ingredients are listed, including 30% by weight blanched peanuts, and 30% by weight unblanched peanuts.

Neither Hansen, nor his superiors to whom he forwarded the faxed transmission, perceived the discrepancy between the 10% maximum allowable peanut content specified by the government RFP and the 60% peanut content listed in the Flavor House fax. On April 14, 1995, DLA awarded the contract to Central Park. On June 12, 1995, DLA personnel traveled to Flavor House to inspect the production of mixed nuts, and it became immediately apparent that the nut mix was nonconforming.

Giesler attempted, unsuccessfully, to renegotiate its contract with the government. After the date for delivery of the nuts had passed without performance, the contracting officer issued a "show cause notice," and on September 6, 1995, DLA terminated Central Park's contract for default. Soon thereafter, the government arranged a contract with a previous bidder, John B. Sanfillippo & Sons, Inc. Due to an increase in the market price of raw nuts since the start of the original bidding process, the government incurred added costs in the amount of $185,625.30 to procure the nuts from Sanfillippo. This amount appears to be undisputed. It also appears that the government did not make any progress payments to Central Park.

## B.  Proceedings in the Court of Federal Claims

On September 3, 1996, Central Park filed suit in the United States Court of Federal Claims. As stated in its second amended complaint, Central Park seeks, in the alternative: 1) damages in the amount of $185,625.30; 2) reformation of the contract; or 3) rescission of the contract. On June 29, 1998, the government counterclaimed for a judgment of $185,625.30 in excess reprocurement costs.

In its September 15, 1999 opinion, on cross-motions for summary judgment, the Court of Federal Claims found that, although Central Park had erred in failing to read the specification, the government's receipt of the March 29, 1995 facsimile from Flavor House gave it constructive

knowledge that Central Park intended to supply a nonconforming nut mix. The trial court determined that the government had a duty to notify Central Park of this error, and that because the government failed to do so, Central Park should be granted rescission of the contract. On October 21, 1999, the court denied Central Park's motion for attorney fees and costs.

## DISCUSSION

### A. Standard of Review

Summary judgment is warranted only where an examination of the record evidence, viewed in the light most favorable to the non-moving party, reveals that no material facts are genuinely disputed and that the moving party is entitled to judgment as a matter of law. Fed. Cl. R. 56(c). We review the trial court's grant of summary judgment *de novo*. *Crnkovich v. United States*, 202 F.3d 1325, 1326 (Fed. Cir.2000).

We review the trial court's decision not to award costs and fees pursuant to the standards of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(a)(1), for an abuse of discretion. *Neal & Co. v. United States*, 121 F.3d 683, 684 (Fed.Cir. 1997).

### B. Did Central Park Excusably "Misread" the Specification?

Parties to a contract are generally bound by its terms. However, we have recognized in limited circumstances that if the government has knowledge, or constructive knowledge, that a contractor's bid is based on a mistake, and the government accepts the bid and awards the contract despite knowledge of this mistake, then a trial court may reform or rescind the contract. *United States v. Hamilton*, 711 F.2d 1038, 1046 (Fed.Cir.1983); *see also Ruggiero v. United States*, 190 Ct.Cl. 327, 420 F.2d 709, 713 (1970). Such relief may be appropriate to prevent the government from overreaching when it knows the contractor has made a significant mistake during the bidding process. *See Ruggiero*, 420 F.2d at 713 ("[W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as [to] something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in face of that knowledge."). Generally, a contractor may obtain reformation or rescission of the contract only if the contractor establishes that its bid error resulted from a "clear cut clerical or arithmetical error, or a misreading of the specifications." *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed.Cir.1987); *Hamilton*, 711 F.2d at 1046. If the contractor's error does not constitute one of these kinds of mistakes, then the contractor is not eligible for reformation of the contract. *See Liebherr*, 810 F.2d at 1157; *Hamilton*, 711 F.2d at 1046. In limited circumstances, however, we have held that, if the government has breached its explicit regulatory duty to examine the contractor's bid for mistakes, then the trial court may rescind a contract, despite an otherwise inexcusable error by the contractor. *See Hamilton*, 711 F.2d at 1048; *see also* 48 C.F.R. § 14.407–1. As will be described below, the facts of this case are distinct from those limited circumstances discussed in *Hamilton*.

Because the availability of equitable relief in this case turns on whether Central Park's error resulted from a "clear cut clerical or arithmetical error, or a misreading of the specifications," we first consider the nature of the mistake that is implicit in Central Park's bid. There is no dispute that Central Park did not commit a "clerical error" or an "arithmetical error" when it submitted its bid. Rather, we must inquire whether Central Park "misread" the specification when it submitted its bid. *See Liebherr*, 810 F.2d at 1157.

The RFP issued by the Department of Defense specifies "CID A–A–20164" as the commercial item description of the requested nut mix. Although the trial court

suggests that the meaning of this CID reference may not have been commonly known among commercial businesses, it is clear that Giesler himself was familiar with this coding system. In his deposition, when questioned whether he personally reviewed the mixed nut specification, he testified that "as you know and I know, that you go to the library and pull up the solicitation thing." Giesler testified, however, that he gave the solicitation to his broker, Farner Bocken, without looking up the reference himself. Mallis, of Flavor House, similarly testified that neither Central Park, nor Farner Bocken, ever gave him copies of the specification or other information regarding the required nut mix:

> Q. If I understand your testimony, it's that Central Park never provided you with any specifications from the government regarding the type of nut that the government was seeking.
>
> A. Absolutely. They never provided me with anything.
>
> Q. Is it also. fair to say that Farner Bocken Company never provided you with any specification regarding what the government was seeking? ·
>
> A. That's true.

The trial court noted that "[a]s any lover of salted nuts knows, the more peanuts, the less expensive the product." Mallis' testimony confirms that the price of the nut mix specified by the government would have been "substantially higher than the 60% peanut mix." Given the low cost of peanuts, it would apparently be in the interest of a nut supplier to include as many peanuts in a nut mix as a buyer would tolerate. Central Park and Flavor House apparently assumed, without any attempt of verification, that a nut mixture containing 60% peanuts would satisfy the Department of Defense.

The mistake in this case is analogous to the contractor's error we discussed in *Liebherr*. In *Liebherr*, the contractor successfully bid to supply the Navy with a crane, but failed to read particularized military requirements listed in a 98–page specification. *See Liebherr*, 810 F.2d at 1154–55. After winning the contract and subsequently discovering that the crane it intended to supply was smaller than that sought by the Navy, the contractor filed a claim for a price increase. We ruled that the contractor's mistake resulted from "gross negligence in failing to read and consider the specifications thoroughly," and that the contractor's assumption that the crane it had intended to supply would meet the Navy's demands was an error in business judgment. We affirmed the denial of reformation. *See id.* at 1157–58.

In this case, the trial court acknowledged that Central Park probably failed to read the specification, but nevertheless concluded, citing *Liebherr*, that this mistake constitutes a "misreading" which may warrant equitable relief:

> Misreading of the specifications includes mistakes such as omissions of costs or mistaken belief about what is called for in specifications. The error – Central Park's, Flavor House's, or both – came from a misreading of, or failure to read, the specification. This is a "misreading" which may entitle a contractor to relief. *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed.Cir.1987).

*Giesler*, 44 Fed. Cl. at 741. Such reliance on *Liebherr* is misplaced. Indeed, *Liebherr* holds to the contrary. In that case, we explicitly stated that the contractor's error—a failure to read the specification—"cannot be said to have resulted from a 'misreading of the specifications,'" and that "an erroneous bid based, like this one, upon a mistake in judgment does not entitle the contractor to reformation of its contract." *Liebherr*, 810 F.2d at 1157. Contrary to the suggestion of the trial court, as quoted above, we conclude that the undisputed facts show that Central Park failed to read the specification, and that Central Park's conduct was not an excusable "misreading" of the specification, but rather amounted to gross negligence in failing to read the specification

and a clear error in business judgment. Except under the limited circumstances we described in *Hamilton,* 711 F.2d at 1046–48, as discussed below, such negligence or judgmental errors preclude contractors from obtaining equitable relief.

■ Central Park points out that the government failed to attach a copy of the specification to the RFP, as appears to have been its customary practice. A March 27, 1995 letter from Russell Kinney of the DLA to Gordon Ferguson of the Defense Personnel Support Center, explaining the DLA's tardiness in procuring the nuts, lends support to Central Park's argument. The letter states that the specification "should have been made an attachment to the solicitation package," and that Kinney was aware, through his March 8, 1995 telephone conversation with Doug Anderson, that Central Park did not have a copy of the specification.

Although the government apparently should have attached the specification to the RFP, we discern little legal significance in this omission. Central Park cites no regulation, and we identify none, requiring that the specification be attached to the solicitation. Although the government is required to send contractors copies of the specifications upon request, *see* 48 C.F.R. § 5.102, it appears that Central Park never requested one. Moreover, Giesler testified that he knew the importance of the CID reference, and that he knew how to go to the library and look it up, but that he left this work to Farner Bocken. His own awareness of the importance of the CID reference is underscored by his call on March 9, 1995 to Flavor House, whereby he requested verification of Flavor House's ability to perform the contract requirements. Knopf's confirmatory letter, stating that "[w]e understand all Government Specifications," further extends the series of miscommunications between or among Central Park, Farner Bocken, and Flavor House. Had the government attached the specification to the RFP, it is possible that these miscommuni-cations would not have arisen. Nonetheless, Central Park's decision to bid on a mixed nut contract without having looked up the maximum allowable peanut content cannot be construed to be a "misreading" of the specification. Indeed, we cannot imagine any circumstance in which a non-reading can be a "misreading." Because, as will be described below, Central Park is not eligible to seek rescission under the narrow grounds we articulated in *Hamilton,* the case relied upon by the trial court, Giesler's failure to read the specification is fatal to his claim for rescission. Despite the trial court's holding, *Liebherr* cannot be construed to the contrary.

## C. May the Contract Nevertheless Be Rescinded in Light of the Government's Failure To Examine Mallis' Post–Survey Facsimile for Discrepancies?

Central Park argues that it deserves rescission of the contract due to the government's alleged failure to examine the March 29, 1995 facsimile for discrepancies between the requested nut mix and the nut mix Flavor House intended to produce. Central Park correctly notes that during the bid submission process, the government has a duty to examine bids for mistakes. 48 C.F.R. § 14.407–1 (previously codified at 48 C.F.R. § 14.406–1 (1994)) ("After the opening of bids, contracting officers shall examine all bids for mistakes."). When the contracting officer has reason to believe that a bid is erroneous, the officer is required to "request from the bidder a verification of the bid, calling attention to the suspected mistake." *Id.* In limited circumstances, where there is a clear showing that the government failed to discharge this regulatory duty, we have permitted rescission of a contract, despite the contractor having made otherwise inexcusable errors in the bid. *See Hamilton,* 711 F.2d at 1048.

The case relied upon by the trial court, *Hamilton,* concerns a contractor that bid on a contract to staff a Navy mess hall.

*See id.* Although the government had estimated that the job required approximately 1100 manhours per day, Hamilton allocated only 456 manhours per day to the job in its bid. Another bidder, Groves, had allotted a similarly small number of manhours to the job, and the government contacted Groves, expressly noting the discrepancy between the government's and Groves' estimated manhours. After Groves withdrew from the bidding process, the government informed Hamilton that its bid was possibly erroneous, but did not specify the discrepancy regarding the estimated manhours, as the regulations required. *See* 32 C.F.R. § 2–406.1 (1979) (presently codified at 48 C.F.R. § 14.407–1) (requiring government to notify bidders of potential mistakes, "calling attention to the suspected mistake"). Hamilton won the contract, and began providing about 1100 manhours, but soon reduced its allocation to 456 manhours, as it had originally bid. The government terminated the contract for default, and sued Hamilton for excess reprocurement costs. Hamilton sought reformation of the contract. We held that Hamilton's error was an error in judgment, and thus that Hamilton was precluded from seeking reformation of the contract. We concluded, however, that the Navy had actual knowledge of the insufficiency of the manhours Hamilton intended to provide, and that the Navy had failed to provide Hamilton with the same notice it had given to Groves. We thus held that the Navy had breached its express regulatory duty to inform Hamilton of the known defect in its bid, and consequently that the Navy was barred from seeking its excess reprocurement costs. Finding that the parties were mutually at fault and that neither party was entitled to recover on its claims, we rescinded the contract.

*Hamilton,* we hold, is a narrow exception to the rule that contractors are barred from obtaining equitable relief when mistakes in their bids arise from other than "a clear cut clerical or arithmetical error, or a misreading of the specifications." *Liebherr,* 810 F.2d at 1157. The critical features of *Hamilton* are that the government clearly had knowledge of the error in Hamilton's bid; that the bid submission process was still underway at the time of the government's alleged breach; that the government failed to give Hamilton the same notice it had given to another bidder with a similarly deficient bid; and that the government was materially and mutually at fault in failing to prevent the losses that occurred. Under the weight of this evidence, we held that the government breached its express duty to notify Hamilton with particularity of the known mistake in its bid, and we permitted rescission of the contract. *See* 32 C.F.R. § 2–406 (1979) (presently codified at 48 C.F.R. § 14.407–1). Central Park argues that this case is analogous to *Hamilton.* For the reasons that follow, we find *Hamilton* inapplicable to the facts of this case.

**1. The government's duty to examine bids for mistakes**

▮ It is undisputed that the government has a general duty to examine bids for mistakes. 48 C.F.R. § 14.407–1. Under this duty, the government must examine bids for "obvious" clerical errors, *see* 48 C.F.R. § 14.407–2, and must examine bids for other errors, such as discrepancies between the contractor's bid and the bids of other contractors or the government's estimate, *see* 48 C.F.R. § 14.407–3. As set forth in the Federal Acquisition Regulations ("FAR"), however, the government's duty to examine contractors' submissions for mistakes only pertains to errors contained in contractors' bids. Under the FAR, this duty does not extend to errors that may be contained in a contractor's subsequent filings.

Our case law interpreting the government's duty to examine bids for mistakes uniformly evaluates the duty only in instances where the alleged error was contained in a contractor's original bid, not in other subsequently submitted papers. *See McClure Elec. Constructors, Inc. v. Dalton,* 132 F.3d 709, 710 (Fed.Cir.1997) (de-

termining whether contracting officer discharged her duty to inform contractor of disparities between government estimate and contractor's estimate); *Liebherr*, 810 F.2d at 1155 (noting that the Navy immediately noted the wide disparity between contractor's bid and the range of the other responsive proposals); *Bromley Contracting Co. v. United States*, 794 F.2d 669, 671 (Fed.Cir.1986) (asking whether contracting officer had constructive knowledge of error in bid due to disparity between contractor's bid and other responsive bid); *Hamilton*, 711 F.2d at 1044 (asking whether government buyer adequately informed contractor of discrepancy between government estimate of required manhours and manhours allocated to job in contractor's bid); *Aydin Corp. v. United States*, 229 Ct.Cl. 309, 669 F.2d 681, 683 (1982) (determining whether contracting officer had constructive knowledge of clerical oversights in bid); *Ruggiero v. United States*, 190 Ct.Cl. 327, 420 F.2d 709, 713 (1970) (inquiring whether contracting officer had constructive knowledge of improper designation in bid); *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492, 495 (1967) (determining whether contracting officer had constructive knowledge of arithmetical mistake in bid); *Wender Presses, Inc. v. United States*, 170 Ct.Cl. 483, 343 F.2d 961, 962 (1965) (asking whether contracting officer had constructive knowledge of mistake in bid due to spread in submitted bids). We can discern no support through these cases that the government's duty to examine bids for mistakes also requires the government to examine the correctness of all of a contractor's subsequent filings. Because the government is generally in privity only with prime contractors, and not with subcontractors, the notion that the government has a duty to identify mistakes in subcontractors' filings after the opening and verification of the prime contractor's bid has even less grounding in the law.

We note that, even had Flavor House expressly pointed out the error in Central Park's bid, it is unclear that the government would have had a duty to relieve the parties of the cost of this error. Rather, it appears that the government would have had the discretionary authority to make a determination as to whether the mistake may be corrected. *See* 48 C.F.R. § 14.407–3(a) ("If a bidder requests permission to correct a mistake and clear and convincing evidence establishes both the existence of the mistake and the bid actually intended, the agency head may make a determination permitting the bidder to correct the mistake."). Central Park, of course, cannot seek relief through this provision, as neither it, nor Flavor House, expressly disclosed to the government that Central Park's bid was premised on an error.

In this case, to the extent that the government's duty to examine Central Park's bid for mistakes arose, the government discharged it. Central Park's bid gives no indication that the nut mix it intended to supply would contain 60% peanuts or any other nonconforming mix. Rather, the bid makes reference to "CID A–A–20164," and states that the bid is for the supply of the "Nuts, Mixed, Shelled" of the RFP. Central Park's bid price, moreover, was only about 10% lower than the next-lowest bid. As noted in the government's counterclaim, the government did perceive that Central Park's price for the goods it was to deliver was only slightly higher than for goods that were to be received at origin. Because there is usually a substantial disparity between such prices, the government called Central Park to verify the correctness of its bid in light of this apparent anomaly. Central Park verified the correctness of its bid by fax the same day. Nothing in the record suggests that the government should have been aware, based on Central Park's bid, of its intention to supply a nut mix containing 60% peanuts.

**2. The government's duty regarding the pre-award survey of Flavor House, subsequent to the opening of Central Park's bid**

■ The crux of the present dispute is whether the government, through its pre-

award survey of the subcontractor, Flavor House, became aware of Central Park's intention to supply a nonconforming nut mix. The purpose of a pre-award survey is to gather information about a relatively unknown provider to make a determination regarding the responsibility of the provider in fulfilling its duties under a proposed contract. *See* 48 C.F.R. § 9.106–1. Russell Kinney, a pre-award survey manager, testified that for companies being inspected, the pre-award survey presentation is "their presentation, their demonstration of their ability to perform." He explained that companies "have every opportunity to bring out questions that they have concerning their possible conflict in specification requirements or to iterate their own limitations concerning their belief, their own belief, and being able to comply with certain portions of the specification." According to Mallis' own testimony, Hansen properly gave Flavor House an opportunity to raise issues concerning the required nut mix. Indeed, Mallis testified that Hansen "asked me for some real specific information" with regard to "the actual product specifications for the mixed nuts." Mallis continued, stating that Hansen wanted "the ingredients, the actual nut grades, peanuts, cashews, almonds, brazils, filberts, et cetera. And then the percentage, the actual grade, you know, the name and the size of the grade, and the percentage incorporated into the mix." Hansen apparently also asked Mallis for a written verification of the content of Flavor House's nut mix, but Mallis did not have one prepared to give to Hansen. Although Hansen's questioning did not uncover the discrepancy between the nut mix sought by the government and the nut mix that Flavor House intended to produce, it is clear that Hansen carried out his responsibility in giving Flavor House an opportunity to raise any issues it might have had regarding the nut mix. In light of his tour of Flavor House's physical plant, and his discussions with Mallis, it appears that Hansen had a legitimate basis for filling out the survey form the next day and checking off the box indicating that Flavor House "HAS AND/OR UNDERSTANDS . . . SPECIFICATIONS." To the extent that Hansen had a duty to correctly perform the pre-award survey, he discharged it.

### 3. The government's duty regarding Mallis' March 29, 1995 facsimile

■ It is true that Hansen filled out the pre-award survey form prior to receiving the written verification of the content of Flavor House nuts that he requested from Mallis. There is no indication in the record, however, that Hansen ever suggested to Mallis that he would hold the survey report in abeyance pending receipt of the Flavor House written verification. To the contrary, a March 24, 1995 letter from Ferguson of the DLA to Kinney squarely directed Kinney to "expedite this survey," noting that "further delay will have a negative impact relative to meeting the required delivery dates." Because the government could not award the contract until the report was complete, it is apparent that Hansen was under significant pressure to finalize the pre-survey report in a timely fashion. Having inspected the Flavor House physical plant and having interviewed Mallis, and apparently having received no indication that Flavor House's nut mix was nonconforming, it seems perfectly reasonable that Hansen would have been confident in his decision to complete the survey report without having received the written specification from Flavor House. Absent some showing that Hansen conditioned completion of the survey on receipt of the written Flavor House specification, or that Hansen had previously perceived a deficiency in Flavor House's nut mix, we attach no significance to Hansen's decision to finalize the pre-award survey report without waiting for Mallis to send a written verification of Flavor House's nut mix.

Two days after Hansen's inspection of Flavor House, and a day after Hansen completed his pre-award survey report,

Mallis faxed Hansen an eight-page transmission, with the third page containing a mixed nut specification listing a 60% peanut content. Hansen apparently did not notice the discrepancy between the government's requested nut mix, and the nut mix described in the facsimile. Perhaps Hansen did not read the subcontractor's transmission at all. Perhaps he misunderstood the specification as providing an example of Flavor House's past performance. We do not know why he, and his superiors to whom he forwarded the facsimile, failed to perceive this defect. In hindsight, it is clear that Hansen should have read the facsimile closely, and informed Central Park and Flavor House about the discrepancy. He did not, however, and we must decide whether this omission has any legal significance.

The examination of the bids and the pre-award survey are the government's institutional mechanisms for catching the kinds of errors that are at the heart of this case. The government's duties to examine bids and conduct pre-award surveys are explicitly set forth in the FAR. See 48 C.F.R. § 14.407 (duty to examine bids); 48 C.F.R. § 9.106 (duty to conduct pre-award surveys). Had the 60% figure been included in Central Park's original bid, it appears that the government would have had a duty to identify the potential mistake, and to notify Central Park, with particularity, about it. See 48 C.F.R. § 14.407-1. And had Mallis disclosed this peanut content to Hansen during the pre-award survey, then it appears that Hansen would have had no grounds for certifying that Flavor House "HAS AND/OR UNDERSTANDS ... SPECIFICATIONS." Here, however, the government properly examined the bid for errors, and satisfactorily completed the pre-award survey. The government's only significant fault was to overlook figures cited in papers filed subsequent to the completion of the pre-award survey. While this omission was certainly unfortunate, Central Park does not cite, and we have not identified, any generalized duty requiring the government to examine all

such subcontractor post-survey paperwork for errors as a condition of contractor liability.

■ The trial court acknowledged that the Federal Acquisition Regulations do not direct the government to review post-bid supplemental information for errors. Nonetheless, the trial court reasoned that once the government receives information responsive to a government request, the government must be found to have constructive knowledge of that information. The trial court stated:

> There can be no question the government had at least constructive knowledge that Flavor House intended to provide a product not in conformance with the solicitation. When the government receives information, particularly where, as here, there is a cover letter identifying the information and indicating it is responsive to a government request, the government must be found to have knowledge of that information.

*Giesler,* 44 Fed. Cl. at 743. In support of this proposition, the trial court relied on *Ruggiero,* 420 F.2d at 713, which, as quoted above, recognizes that rescission or reformation may be appropriate when a contracting officer has constructive knowledge of a mistake in a prospective contractor's bid that was caused by a clerical error, an arithmetical error, or a misreading of the specification. *Ruggiero,* however, as we have noted, is inapplicable to this case, as it concerns excusable mistakes made in a bid, not inexcusable errors disclosed in supplemental post-survey filings. Furthermore, the trial court's unexplained expansion of *Ruggiero* would impose vast new duties on the government. The duties of the government are detailed in the FAR, and we find no authority, based on the FAR and our case law, to extend these duties and impute to the government knowledge of the mistakes and inconsistencies contained in all the paperwork that it receives after the opening and verification of bids, and after

the pre-award survey report has been completed. To impose such a requirement on the government would create a boundless duty, and a facile means for contractors such as Central Park to escape liability for their inexcusable blunders. We accordingly hold that the government has no legal duty to examine for mistakes contractors' and subcontractors' paperwork submitted subsequent to the opening and acceptance of their bids, and after the completion of the pre-award survey report. In this case, the government perhaps should have perceived the discrepancy apparent in Flavor House's transmission, but the government's failure to do so does not make Central Park eligible for rescission of the contract it breached.

Although the trial court concluded that *Hamilton* is factually similar to the present dispute, and that *Hamilton* provides a legal basis for concluding that Central Park is entitled to rescission, we find *Hamilton* to be fundamentally distinct from this case. The most important difference between *Hamilton* and the present dispute is that, in *Hamilton*, the government had an express duty to examine the contractor's bid for errors. In this case, because the March 29, 1995 fax was not a bid and indeed arrived after Central Park's bid was opened and verified, and after the government had completed its pre-award survey of Flavor House, the government had no duty to examine the fax for errors. The second distinction between *Hamilton* and this case is that, in *Hamilton*, the government had actual knowledge of the deficiency of the contractor's bid. In this case, contrarily, the government was never alerted to the possible error evidenced by the subcontractor's March 29, 1995 fax. And third, the government's alleged error in this case was far less material than that discussed in *Hamilton*. In *Hamilton*, the government had actual knowledge that the contractor had allocated less than half the Navy's estimated manhours to the proposed job, yet failed to give express notice of this

deficiency, despite the regulatory requirement to do so and despite having given precisely such notice to another bidder that made the same error. In this case, by contrast, the government's only significant error was its failure to examine Mallis' March 29, 1995 fax for discrepancies with the RFP and the bid by Central Park, after having verified Central Park's bid, and after having conducted its pre-award survey of Flavor House. Because the government's mistake was minor, because the government had no actual knowledge of the contractor's intention to supply a nonconforming nut mix, and because the government had no duty to examine the post-bid paperwork for mistakes, this case is fundamentally distinct from *Hamilton*. We hold that Central Park cannot rely on *Hamilton* to obtain rescission of its contract.

### D. Is Central Park Entitled To Relief Under the "Superior Knowledge" Doctrine?

██ Central Park also urges that it is entitled to equitable relief under the theory that the government had "superior knowledge" of the mistake, and that the government breached its duty to inform Central Park of this mistake. The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance. The doctrine of superior knowledge is generally applied to situations where: (1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *Hercules Inc. v. United States,* 24 F.3d 188, 196 (Fed.Cir.1994).

We hold that the doctrine is inapplicable to the facts of this case. It is publicly available knowledge that CID A–A–20164 specifies a mixed nut mix containing a maximum of 10% peanuts. Central Park was in privity with Farner Bocken and Flavor House, and so it had equal, if not greater, access to the same information that the government eventually obtained regarding the nonconforming nuts. Because Central Park could have readily obtained this information, the government was not obliged to volunteer it. *See H.N. Bailey & Assocs. v. United States,* 196 Ct.Cl. 166, 449 F.2d 376, 383 (1971) ("[T]he government is under no duty to volunteer information in its files if the contractor can reasonably be expected to seek and obtain the facts elsewhere."). Accordingly, Central Park's argument under the superior knowledge doctrine cannot prevail.

## CONCLUSION

We hold that Central Park's failure to obtain and read the nut mix specification referenced in the solicitation cannot be an excusable "misreading" of the RFP. We also hold that the government had no legal duty to examine for possible mistakes the March 29, 1995 facsimile transmission, which was submitted subsequent to the opening, verification, and acceptance of Central Park's bid and completion of the pre-award survey and survey report. Moreover, we hold that Central Park cannot prevail under the superior knowledge doctrine. We therefore conclude that the Court of Federal Claims erred in holding that Central Park was eligible for and deserving of rescission of its contract with the government. We accordingly reverse the summary judgment of the Court of Federal Claims rescinding the contract. Central Park's appeal of the trial court's decision denying its motion for attorney fees and costs is thus dismissed as moot, as Central Park is no longer the prevailing party. Because Central Park, without excuse, breached its contractual duty to supply the specified nuts to the government,

we hold that the government is entitled to prevail on its counterclaim for excess reprocurement costs. We accordingly remand this case to the Court of Federal Claims for the entry of judgment in favor of the United States on the United States' counterclaim.

*REVERSED–IN–PART, DISMISSED–IN–PART, AND REMANDED.*

## COSTS

Each party to bear its own costs.