ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Deas Construction, Inc. | ) | ASBCA No. 60633 |
| | ) | |
| Under Contract No. FA4855-14-M-V003 | ) | |

APPEARANCES FOR THE APPELLANT: Mr. Douglas Reitmeyer
  Vice President for Litigation
Mr. Kirk Deas
  President

APPEARANCES FOR THE GOVERNMENT: Jeffrey P. Hildebrant, Esq.
  Air Force Deputy Chief Trial Attorney
Heather M. Mandelkehr, Esq.
Anna F. Kurtz, Esq.
  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE NEWSOM

This appeal concerns the termination for convenience of a $42,000 commercial services contract. Appellant contends that it fully performed the contract before the termination and is entitled to full payment. The government contends that appellant performed only a fraction of the scope of work and is only entitled to a fraction of the contract price as a termination settlement.

Appellant elected to proceed under the Board's Accelerated procedure of Board Rule 12.3. After a hearing, for the reasons explained below, we hold that appellant did not fully perform the contract and that the government's determination of the amount of appellant's termination settlement is reasonable.

FINDINGS OF FACT

1. This appeal concerns a contract to repair an Isochronal Inspection Maintenance Stand (ISO Stand or Stand) and deliver a technical manual for the Stand (R4, tab 7 at 4, tab 2 at 2).

2. An ISO Stand is an elevated platform that fits around and up against an aircraft. The Stand allows maintenance personnel to access and walk 360 degrees around the aircraft to perform repairs and maintenance. This enables personnel to work more efficiently than if they had to climb up and down ladders to perform repairs or maintenance. (Supp. R4, tabs 148, 152; tr. 1/223-24, 2/48)

3. The particular ISO Stand at issue was designed and built by a company called KWD Manufacturing, Inc. (KWD) (R4, tab 4; tr. 2/48, 54). The Stand had been acquired sometime in the past, and by 2013 it was located at Cannon Air Force Base, lying mostly disassembled in a state of disrepair. Cannon AFB maintenance personnel did not have the technical expertise to repair it. (Tr. 1/223-25)

4. In 2013, the Air Force contacted KWD and inquired how to make the Stand functional (tr. 2/53). After examining the ISO Stand, in June 2014 KWD submitted an unsolicited quote to repair the Stand for a price of $109,390.10 (R4, tab 51 at 1; supp. R4, tab 56).

5. The parties dispute whether KWD also supplied the government with a list of parts missing from the ISO Stand. KWD's president, John Deane, testified that he provided with the quote a cost workup that included "a conglomerate of many items." Questioned whether this included a list of parts missing from the Stand, he testified that he did not supply "a per se cross down the line list" where "could you submit it and have everybody quote in it – I did not." (Tr. 2/214-15) The contracting officer testified that the Air Force did not have a list of missing parts (tr. 1/57). Based on this testimony, we find that KWD provided a list of materials but not a missing parts list that could be used by other offerors to generate a quote.

6. In 2014, the Air Force decided to hold a competitive procurement for award of a commercial services contract to repair the ISO Stand (supp. R4, tab 73; tr. 1/38-39, 48-49, 224-28).

7. The Air Force issued a request for quotations on 18 September 2014 (R4, tab 1). The solicitation contained a single contract line item number (CLIN) that described the work as follows:

> The contractor shall provide non-personal services, to include all personnel, equipment, labor, supervision, and other items and services necessary to repair an Isochronal Inspection [ISO] Maintenance Stand Part No. 38-1-00-5, and provide all required manuals and documents in accordance with the Performance Work Statement (PWS) dated: 16 September 2014.

The solicitation called for a single unit price for this CLIN. (R4, tab 1 at 2) The solicitation also provided that the "stand must be tested and the end item repaired to a new refurbished condition as identified in the Performance Work Statement (PWS)" (*id.*).

8. The PWS elaborated, stating:

> **1. DESCRIPTION OF SERVICES**
> The Contractor shall provide non-personal services, to include all personnel, equipment, labor, supervision, and other items and services necessary to ensure the fabrication, shipping, installation, and assembly of the Isochronal Inspection (ISO) Maintenance Stand (Part No. 38-1-00-5) is completed and repaired to a new refurbished condition. The maintenance stand shall be in compliance with Air Force Instruction (AFI) 91-203, Occupational Safety and Health Act (OSHA), and all other applicable Air Force, federal, state, and local requirements.
>
> **1.2** The Contractor shall test the assembled unit to ensure the stand is fully functional, properly fits and stores in hangar, and successfully wraps around aircraft.

(R4, tab 2 at 1)

9. The PWS specified two deliverables: (1) the "ISO Maintenance Stand 38-1-00-5: 100% assembled, fully functional, and in compliance with all applicable regulations" and (2) "Technical Manual with equipment illustrated parts breakdown" (R4, tab 2 at 2).

10. Shortly after issuing the solicitation, the Air Force issued Amendment 1, announcing a site visit to be held on 22 September 2014 (R4, tab 5).

11. Appellant, Deas Construction, Inc. (Deas) is a small business. Prior to the ISO Stand project, Deas had bid on only one federal acquisition and had never been awarded nor performed a federal contract. (Tr. 2/221-29)

12. Deas sent a representative, Mr. Christian Hernandez, to the site visit. Mr. Hernandez took photographs of the Stand and asked questions. (Supp. R4, tab 91)

13. Following the site visit, the Air Force issued Amendment 2 to the solicitation containing written answers to the questions asked during the site visit. The answers to two of the questions are key to this dispute:

3

- Are the electrical repairs the main focus of this requirement, or is the end item the overall requirement?

  – The requirement is for a fully functional end item, to include electrical. Reference PWS paragraph 2.1, 2.2

- Is there a list of items missing or needing repair/replacement, or an estimate of what components are missing?

  – No, the awarded contractor will have to determine what is missing or needing replacement to deliver the completed ISO Stand 38-1-00-5

(R4, tab 6) (Bold deleted)

14. Kirk Deas, the owner of Deas, interpreted "the awarded contractor" to mean that the contractor who was awarded the contract – but not the bidders – would determine what parts were missing. He testified that he thought the job required the contractor only to assemble the parts that were available, not to acquire missing parts. (Tr. 2/235-36, 243) If he had known that the Air Force would require Deas to provide missing parts, Deas would not have bid the job (tr. 2/245).

15. Two offerors submitted quotations in response to the solicitation, KWD and Deas (tr. 1/58). KWD, the original manufacturer, re-submitted its previous quote of $109,390.10 (supp. R4, tab 99 at 2; tr. 1/58-61). Deas submitted a quote of $42,000.00 (supp. R4, tabs 94, 99 at 1-2).

16. The contracting officer noted the price difference but did not think that there was a problem with Deas' pricing. She assumed that Deas knew how to bid the project. She also believed KWD's quote was excessively high because, as she explained, "KWD's quote was the exact same quote that had been turned in earlier as a sole-source quote. In my experience, sole-source quotes have always been higher than what we would expect from a competed contract." (Tr. 1/58-59)

17. On 30 September 2014, the Air Force awarded Contract No. FA4855-14-M-V003 to Deas (R4, tab 7; supp. R4, tab 105). The contract contained the same CLIN for "ISO Stand Repair" that was in the solicitation, identifying it as a firm-fixed-price CLIN for $42,000. As in the solicitation, the CLIN referred to the PWS, which was an attachment to

4

the contract. There were no other CLINs, and no CLIN to be paid on a cost-reimbursement basis. (R4, tab 7)

18. The contract contained two different termination clauses. It contained Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAY 2014), which contains the following termination provision:

> *Termination for the Government's convenience.* The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The contract shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(R4, tab 7 at 7) The contract also contained FAR 52.249-1, TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SHORT FORM) (APR 1984) (*id.* at 8). The contracting officer testified that it was an error to include FAR 52.249-1. Because this was a commercial services contract, she explained that the applicable termination clause was FAR 52.212-4(l). (Tr. 1/184-85)

19. On 26 September 2014, through a third party named Stephan Jordaan, Deas contacted KWD to request an owner's manual and assembly help for the Stand. A KWD employee emailed a copy of the manual. (Supp. R4, tab 98) Subsequently on 2 October 2014, KWD notified Mr. Jordaan that the manual was proprietary, requested that it not be copied or distributed, and requested that the copy provided to Mr. Jordaan be destroyed (supp. R4, tab 107).

20. Deas engaged a subcontractor to assemble the Stand at Cannon AFB (tr. 2/255). Deas also purchased bolts with which to assemble the parts, at a cost of $398.27 (supp. R4, tab 135 at 11-13; tr. 2/255-56). Deas presented no evidence whether, or to what extent, the bolts were used in performing the contract. It presented

no evidence of what became of the bolts that were not used, i.e., whether they were sold, used on other jobs, or placed in inventory.

21. The subcontractor worked to assemble the Stand, but by early February 2015 reached a stopping point, and did not complete the assembly, "due to missing items/hardware that need to be ordered" (R4, tab 11). Deas did not deliver a fully functional ISO Stand to the government (tr. 1/70).

22. At that time, an Air Force technical sergeant was asked to check the status of the project. After taking what he characterized as a "quick glance" or a "mechanic's eyeball" at the Stand, he reported that the ISO Stand "looks to be about three-fourths of the way complete," an estimate that he called a "ballpark figure" (R4, tab 11; tr. 2/14-18). We find that this estimate cannot be relied upon to determine the percentage of work performed by Deas on the contract, because the estimate was based upon a "quick glance."

23. In early February 2015, Deas contacted the Air Force to discuss billing for the work performed (R4, tab 10). Thereafter a disagreement arose regarding payment and the scope of work required under the contract. Deas demanded payment for work performed (e.g., R4, tabs 12, 13). The contracting officer requested Deas to provide a cost estimate for the parts needed but she refused to process payment because the deliverables required by the contract had not been provided (R4, tab 15).

24. Deas objected to having to obtain pricing for missing parts, stating that Deas "has no legal obligation to put more time and effort into this contract," that "the work that was required...has already been completed" (R4, tabs 16, 25). On 11 March 2015, the contracting officer responded by noting that Deas was "responsible for all terms and conditions of the contract" (R4, tab 24).

25. Deas contacted KWD seeking pricing for Stand components (R4, tabs 17, 21). KWD refused to provide a quote, asserting that the owner's manual for the Stand contained information proprietary to KWD, and warning Deas against distribution of this proprietary data without permission (R4, tab 27 at 3). KWD also notified the Air Force that Deas and its representative "have been using our proprietary data for their gain without our permission" (R4, tab 26).

26. On 20 March 2015, the contracting officer terminated the contract for the government's convenience, citing FAR 52.212-4(l) (R4, tab 30). In the notice, the contracting officer explained that the "Government has been made aware that you will not be able to perform this contract without proprietorial information." She directed Deas to stop all work immediately. (Id.)

6

27. On 1 April 2015, the contracting officer requested Deas to provide a termination settlement proposal within 15 days and provided standard forms for this purpose (R4, tab 34). Deas did not provide a proposal (tr. 1/83).

28. On 18 May 2015, the contracting officer again requested a termination settlement proposal (R4, tab 36).

29. This time, Deas responded by email dated 5 June 2015. It attached termination settlement proposal forms that included a demand for payment of $42,000 – the full contract price. Deas explained on the form that "settlement proposal is based on percentage complete." In the sections calling for performance costs, expenses, and other financial data, Deas provided no cost, expense, or other financial detail, writing "N/A" throughout most of the form. Regarding subcontractor costs, Deas wrote that its "[s]ettlement with subcontractor is based on the terms of his original subcontract agreement, work completed and accepted by the government, i.e., it is a 'Pay when paid' subcontract agreement and the subcontractor was fronted his mobilization costs." (R4, tab 37 at 9)

30. Separately, in June 2015 Deas sent a copy of KWD's owner's manual for the ISO Stand to the contracting officer (supp. R4, tab 131).

31. The contracting officer did not respond to Deas' termination settlement proposal, nor did she process any payment to Deas (tr. 1/84-85). The contracting officer testified that she could not authorize payment of the full contract amount because Deas had not completed the ISO Stand nor provided the contract deliverables (tr. 1/84). She testified that she did not respond to Deas' proposal because "I didn't know how to respond to it. The contractor kept insisting that the work was completed. I would go look at the stand and I could see that nothing had been done to it." She added: "it was impossible to make a decision about payment to Deas Construction because I had no way of knowing at the time as to how much work they had done, how much effort they had put into the contract." (Tr. 1/85-86)

32. Meanwhile, the government entered into a contract with KWD to inspect, repair, assemble, and test the Stand for $113,010.65 (supp. R4, tab 162).

33. On 18 March 2016, Deas mailed a claim for $43,940.80 plus interest and requested a final decision within 60 days (R4, tab 41). The contracting officer received the claim on 22 April 2016 (R4, tab 43). In the claim, Deas demanded full payment and alleged that the termination was improper because it occurred after Deas fully performed the contract. Deas further contended that even if the termination were proper, the termination for convenience clause entitled it to full payment plus the cost of performing extra work. Deas also alleged that the contracting officer withheld superior knowledge. (R4, tab 41)

7

34. The contracting officer did not initially issue a final decision because she "had no way of knowing how much to estimate their level of effort was in the contract." She stated that Deas did not substantiate their level of effort but simply asserted that "the work was fully completed and that they wanted full payment." (Tr. 1/92-93)

35. On 17 June 2016 Deas filed this appeal from a deemed denial of the claim.

36. During discovery in this appeal, on 29 September 2016, the contracting officer issued a final decision awarding a termination settlement of 10 percent of the contract price, or $4,200 (supp. R4, tab 163). Appellant did not appeal this decision.

37. This decision was based upon an analysis performed by KWD's president, John Deane, who estimated the percentage of contract work performed prior to KWD's effort to complete the Stand. According to KWD's analysis, approximately 90 percent of the contract work, measured by cost, involved fabrication of parts. Because Deas did not fabricate any parts, KWD estimated that Deas performed no more than 10 percent of the contract effort. (Supp. R4, tab 149)

38. KWD's analysis was based in part on a comparison of the condition of the ISO Stand in 2013 (before Deas performed work) and its condition in December 2015 (after Deas performed work) (tr. 2/101-02, 136-40). This comparison does not exactly match the time period of Deas' work (tr. 2/140-41). Nevertheless, we find the analysis to be a reasonably reliable assessment of the amount of contract work completed by Deas.

39. During the hearing, Deas presented no evidence of the cost it incurred to perform the contract, other than the cost to purchase bolts for $398.27 (finding 20). Mr. Deas testified that he did not know how much time Deas or its subcontractors spent performing the contract (tr. 2/299). He also testified that, if the government's interpretation of the contract were correct, he did not know what percentage of the contract – as the government interpreted it – Deas had completed (*id.*).

## DECISION

This dispute stems from a disagreement over contract interpretation. Because the parties disagree as to the scope of work, Deas contends that it fully performed the contract and is thus entitled to payment of the full contract price plus settlement expenses (app. br. at 3-4). The government contends that Deas performed only a fraction of the work and is only entitled to a fraction of the contract price (gov't br. at 28-36).

8

## Interpretation of the Contract Work Scope

In resolving contract interpretation disputes, we examine the contract as a whole, harmonizing and giving a reasonable meaning to all of its provisions. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *ThinkQ, Inc.*, ASBCA No. 57732, 13 BCA ¶ 35,221 at 172,825. An interpretation that gives reasonable meaning to all parts of a contract is preferred to one that leaves a portion meaningless. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965); *LRV Environmental, Inc.*, ASBCA Nos. 58727, 58728, 15-1 BCA ¶ 36,042.

Deas interpreted the contract as requiring that it assemble the Stand only to the extent parts were available, and not to require it to obtain missing parts. This interpretation derives from the following question and answer in Amendment 2 to the solicitation:

- Is there a list of items missing or needing repair/replacement, or an estimate of what components are missing?

  – No, the awarded contractor will have to determine what is missing or needing replacement to deliver the completed ISO Stand 38-1-00-5

(Finding 13)

Noting that the answer stated that the "awarded contractor" would determine what parts were missing, Deas argues that "bidding" contractors are not "awarded contractors" and thus the amendment did not require "bidding" contractors to determine what parts were missing (app. br. at 3). From that premise, Deas argues that the contract required it only to assemble the Stand from parts already on hand. If parts were missing, Deas argues, they were the Air Force's responsibility. (App. br. at 3-4)

The government contends that the contract required Deas to provide a "fully functional ISO Maintenance Stand in a new refurbished condition," not just to assemble the existing pieces. It points to various parts of the solicitation and contract requiring a "fully functional" Stand that has been "completed and repaired." (Gov't br. at 28-29)

We agree with the government. The solicitation and contract stated that the contractor was to provide an ISO Stand that was "completed and repaired to a new refurbished condition." The PWS expressly required a "100% assembled, fully functional" Stand. (Findings 7-9, 17) The contract explicitly required "fabrication," thus, the contract required Deas to fabricate parts if necessary to provide a functional ISO Stand (findings 8, 17). Deas' interpretation ignores this language and indeed would read

9

out of the contract any requirement that the Stand delivered by Deas be functional. Because Deas' interpretation would render these provisions meaningless, it is unreasonable. *Hol-Gar Mfg.*, 351 F.2d at 972; *LRV Environmental*, 15-1 BCA ¶ 36,042.

Amendment 2, upon which Deas relies, is consistent with the government's interpretation. That Q&A described the work that the contract would require, i.e., what the "awarded contractor" must do (finding 13). In this way, it is no different from, and consistent with, the rest of the solicitation and PWS, which likewise described the work to be performed after award (findings 7-9, 17). Deas' interpretation of Amendment 2, in contrast, is neither logical nor internally consistent. By stating that the "awarded contractor" would determine what parts were missing, the Q&A did not address, let alone limit or dictate, whether or not a bidder may determine what parts were missing. Moreover, Deas' interpretation of this answer is inconsistent with the immediately-preceding answer which stated that "the requirement is for a fully functional end item" (finding 13). Finally, we note that even if the solicitation *had* specified whether or not a bidder should determine which parts were missing, it does not follow that the contract did not require a fully functional ISO Stand. Deas' interpretation is a *non sequitur*.

Accordingly, we conclude that the contract required Deas to supply a fully functional ISO Stand which included fabrication of missing parts if necessary. Deas did not supply a fully functional ISO Stand (finding 21). Therefore Deas did not fully perform the contract. The convenience termination was not improper[1], and appellant is not entitled to payment of the full contract price.

Superior Knowledge

Deas next argues that the government had superior knowledge that it withheld from Deas, specifically, Deas alleges that the government failed to inform it that its price was too low and that the original manufacturer quoted $109,390.10 for the work. Deas contends the difference in quoted prices should have caused the government to question Deas' $42,000 quote and particularly whether Deas and KWD quoted on the same basis. (App. br. at 5-7)

---

[1] In its claim, Deas argued that the termination for convenience was improper on the ground that Deas completed the contract prior to the termination (finding 33). That contention is absent from its post-hearing brief. To the extent that Deas continues to advance that argument, it is rejected, because as noted herein, Deas did not complete the contract prior to the termination.

To establish a breach of the government's implied duty to disclose superior knowledge, Deas has the burden to establish four elements:

> (1) [A] contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000); *PGDC/Teng Joint Venture*, ASBCA No. 56573, 10-1 BCA ¶ 34,423 at 169,923-24.

We reject Deas' superior knowledge theory.[2] Deas cannot establish at least two of these factors, factors 2 and 3. The government was unaware that Deas did not know how to bid the project. Indeed the contracting officer believed that Deas' price was reasonable and KWD's price was too high. (Finding 16) The solicitation was not misleading for the reasons already explained. And the Procurement Integrity Act would have prohibited the government from disclosing KWD's pricing prior to award.[3] 41 U.S.C. § 2102(a).

---

[2] Deas has at times argued that the government had a duty to disclose to Deas a list of missing parts, although it did not mention this argument in its post-hearing brief. To the extent Deas continues to assert it, we reject that theory, among other reasons because the government did not have a list of missing parts (finding 5).

[3] We considered whether Deas made a unilateral mistake in its interpretation of the specifications that would have entitled it to rescission of the contract, as explained in, among other authorities, *McClure Electrical Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997); *Ruggiero v. United States*, 420 F.2d 709, 713 (Ct. Cl. 1970); *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849; or *Pavco, Inc.*, ASBCA No. 23783, 80-1 BCA ¶ 14,407. We directed the parties to address this issue in their briefs, but Deas did not do so. We conclude that Deas does not wish to pursue a unilateral mistake theory and thus do not consider it further.

Termination Settlement Costs

To determine the correct measure of termination settlement costs, we refer to the termination for convenience clause,[4] which provides that Deas is entitled to "a percentage of the contract price reflecting the percentage of the work performed" plus "reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination." FAR 52.212-4(l).

The government contends that Deas completed only 10 percent of the work, and is entitled to 10 percent of the contract price, or $4,200 (finding 36). This assessment was based on a cost analysis concluding that 90 percent of the cost of performance derived from fabrication of parts. Deas did not fabricate any parts, so according to the analysis, Deas completed no more than 10 percent of the contract. We find that analysis reasonable. (Findings 36-38)

Deas bears the burden to prove that it is entitled to something additional. *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003); *Lockheed Martin Corp.*, ASBCA Nos. 53032, 54064, 04-1 BCA ¶ 32,559 at 161,050. Deas has not carried that burden. It challenges the government's analysis as "speculative" (app. br. at 8), but offers none of its own evidence of the percentage of work completed. Other than the cost to purchase bolts, Deas has not disclosed its own costs of performance (finding 39). Deas' only response was to cite an email from a technical sergeant stating that he thought the Stand was approximately three-fourths complete (app. br. at 9), an estimate we find unreliable (finding 22). In summary, we find that Deas completed no more than 10 percent of the contract.

Deas also contends that it is entitled to "the cost of the bolts as detailed and submitted within its claim" (app. br. at 12). The cost of bolts included in the claim was $398.27 (finding 39). The flaw in Deas' claim for the cost of bolts is that Deas presented no evidence of the extent to which the bolts were used in performing the contract or put to other uses (finding 20). Accordingly, we hold that Deas has not

---

[4] The contract contained two different termination for convenience clauses (finding 18). Both parties rely upon the termination clause for commercial contracts at FAR 52.212-4(l) (gov't br. at 41; app. br. at 8). Because this is a commercial services contract, we agree that FAR 52.212-4(l) is the applicable clause.

carried its burden to prove that the cost of the bolts was a reasonable charge resulting from the termination.

## CONCLUSION

Accordingly, the appeal is granted in part and denied in part. Deas is entitled to a termination settlement of $4,200.00 plus Contract Disputes Act interest from 22 April 2016 until paid.

Dated: 13 December 2016

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60633, Appeal of Deas Construction, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

13