ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| H&L Contracting LLC | ) | ASBCA No. 63695 |
| | ) | |
| Under Contract No. W912WJ-22-C-0012 | ) | |

APPEARANCES FOR THE APPELLANT:    Michael H. Payne, Esq.
   Cohen Seglias Pallas Greenhall
    & Furman PC
   Philadelphia, PA

        Matthew C. Long, Esq.
   Cohen Seglias Pallas Greenhall
    & Furman PC
   Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
   Engineer Chief Trial Attorney
   Theresa A. Negron, Esq.
   Sheena M. Wandera, Esq.
   Engineer Trial Attorneys
   U.S. Army Engineer District, New England

## OPINION BY ADMINISTRATIVE JUDGE MCLISH

Appellant H&L Contracting LLC (H&L) appeals from the final decision of a contracting officer for the United States Army Corps of Engineers (USACE) denying H&L's claims arising from a contract to dredge channels at Newburyport Harbor, Massachusetts.

The contract required dredging of shoaled sediments from two channels: a nine-foot channel within the harbor adjacent to the Town of Newburyport and a 15-foot channel located at the mouth of the Merrimack River where it meets the Atlantic Ocean. (R4, tab 6 at 180, tab 7 at 221-22) This appeal involves the 15-foot channel, also called the entrance channel.

H&L intended to use its cutterhead dredge the *Oyster Bay* to dredge the entrance channel. The *Oyster Bay*, however, completed none of the required dredging due to the size of the sea swell at the channel. H&L eventually abandoned its plan and subcontracted with another company to provide a larger dredge better able to perform

in the conditions at the entrance channel at that time of year. That larger dredge quickly completed the work. H&L then submitted a claim to USACE seeking the extra costs it incurred in subcontracting for the larger dredge, alleging that USACE withheld superior knowledge and issued defective specifications. It contends in the alternative that the parties made a mutual mistake of fact.

After we denied cross-motions for summary judgment, the parties agreed to submit the appeal for a decision without a hearing under our Rule 11. Only entitlement is before us. For the reasons below, we sustain the appeal as to entitlement.

FINDINGS OF FACT

I.      The Solicitation

The parties' dispute largely concerns the content of the solicitation issued by USACE on May 20, 2022 for the Newburyport dredging contract that was ultimately awarded to H&L (the Solicitation) (app. supp. R4, tab 20 at 1636).[1]

The drawings showed that the entrance channel was located at the mouth of the Merrimack River, near two jetties protecting the harbor, and extending out into the Atlantic Ocean (R4, tab 7 at 222-23). The specifications included the following description of the sea conditions at the entrance channel:

> The tidal currents at the entrance to the harbor can be substantial, creating potentially dangerous conditions. Under good weather conditions, the sea swell is typically 1-2 feet in a northerly direction. In normal weather conditions, the sea swell can range from 2 to 4 feet or more.

(R4, tab 6 at 182, tab 4 at 158)

The Solicitation stated that its description of the project conditions "is for the Contractor's information" and that the government "shall not be responsible for any

---

[1] This decision references three solicitations. The solicitation that led to the contract in dispute, Solicitation No. W912WJ-22-B-0011, is referred to as "the Solicitation." The solicitation USACE issued in 2010 for a contract to dredge the same entrance channel at Newburyport is referred to as "the 2010 Solicitation." Finally, the USACE solicitation for a contract to dredge at nearby Hampton Harbor, New Hampshire, is referred to as "the Hampton Harbor Solicitation."

interpretation of or conclusion drawn from the data or information by the Contractor" (R4, tab 6 at 182).  The specifications further indicated that "[b]efore commencing work at the site, the Contractor shall verify the existing conditions indicated on the drawings and in the specifications," and included a standard Federal Acquisition Regulation (FAR) clause under which the contractor acknowledges that it has "investigated and satisfied itself as to the general and local conditions which can affect the work or its cost," including such things as "uncertainties of weather . . . , tides, or similar physical conditions at the site," as well as "the character of equipment . . . needed during work performance. . . ." (*id.*; R4, tab 4 at 139 (incorporating FAR 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984)).

Among the USACE employees assigned to the Newburyport project team and tasked with preparing and approving the contract specifications in the Solicitation were Brendan Sprague and Thomas Marcotte (app. br., ex. 2 at 7).  Mr. Sprague prepared the initial draft of Specification 01 11 00, which included the description of sea conditions quoted above.  Mr. Marcotte drafted the remaining Specifications (app. br., ex. 7, Marcotte depo tr. at 74:5-22).  Mr. Sprague and Mr. Marcotte were knowledgeable of sea conditions at the entrance channel based on prior assignments for USACE, including the preparation of the 2010 Solicitation, discussed in more detail below.

Mr. Sprague based the Solicitation's description of sea conditions in the Newburyport channels on USACE's solicitation a few years earlier for dredging Hampton Harbor, New Hampshire (the Hampton Harbor Solicitation) (app. br., ex. 1, Sprague depo tr. at 54:3-11).  Hampton Harbor is located roughly five miles from Newburyport and that project also involved dredging an entrance channel leading from the Atlantic Ocean into the harbor (app. supp. R4, tab 3 at 399; app. br. ex. 4, Haney depo tr. at 32:19-25, 44:3-25).  H&L had been the contractor for that project and successfully completed the dredging there in November and December 2019 using a 16-inch cutterhead dredge (app. br., ex. 3, Haney aff. ¶ 6; ex. 5, Coward depo tr. at 30:2-8, 39:9-13).

The Hampton Harbor Solicitation had described the conditions there as:

> e. Conditions at Entrance Channel to Harbor:  The tidal currents at the entrance to the Harbor can be substantial (up to 5 knots during maximum flood and ebb tidal periods), creating a potentially dangerous condition.  Under optimum weather conditions, the sea swell is typically 1-2 feet in a southerly direction.  In normal weather, the sea swell can range from 2-4 feet.

3

(App. supp. R4, tab 3 at 402)  Mr. Marcotte had been involved in preparing the specifications for the Hampton Harbor Solicitation (app. supp. R4, tab 6 at 742-43). He testified that the conditions at the Newburyport Harbor entrance channel presented a "rougher situation" than those at the Hampton Harbor entrance channel (app. br., ex. 7, Marcotte depo tr. at 78:22-79:2).

The Solicitation's description of conditions at the 15-foot channel at Newburyport was similar, but not identical, to USACE's description of conditions at Hampton Harbor.  Specifically, USACE changed the word "optimum" to "good", changed the wind direction from "southerly" to "northerly," and added the words "or more" after "2-4 feet" (*compare* app. supp. R4, tab 3 at 402 *with* R4, tab 6 at 182). The words "or more" were added at the suggestion of a USACE employee in the Construction Office who lacked specific knowledge of the sea conditions at the entrance channel and who had previously advocated omitting any description of the sea conditions (app. br., ex. 1, Sprague depo tr. at 102:6-103:23).  Mr. Marcotte rejected omitting any mention of the sea conditions, stating "[a] non-local may not be fully aware at bidding.  The Merrimack at the mouth can be a challenge and I would like to get this information out."  (App. supp. R4; tab 11 at 992)  Mr. Marcotte, however, concurred with adding the phrase "or more" (*id.* ; app. br. ex. 1, Sprague depo tr. at 130:10-12).  Mr. Sprague opposed the addition of the phrase "or more," believing it to be misleading; nonetheless, it was added (app. br. ex. 1, Sprague depo tr. at 130:4-9).

The Solicitation did not define the terms "good weather conditions" or "normal weather conditions," nor did it describe how often weather conditions at the 15-foot channel are "good," "normal" or something else (*e.g.,* bad).  Similarly, the Hampton Harbor Solicitation had not defined "optimum" or "normal" weather conditions or explained the frequency with which those or other conditions occur.

Both the Hampton Harbor and Newburyport Solicitations referred to substantial "tidal currents" that could create potentially dangerous conditions.  Mr. Sprague and  Mr. Marcotte both understood that "tidal conditions" and wave heights are distinct phenomena.  (App. br., ex. 1, Sprague depo tr. at 72:13-24; ex. 7, Marcotte depo tr. at 82:15-83:1)

The USACE personnel who prepared the Solicitation understood that the stated wave height ranges represented year-round conditions, not conditions specific to the dredging window during which the contract permitted dredging (app. br., ex. 1, Sprague depo tr. at 118:11-18).  For hydraulic dredging, the dredging window was from September 1, 2022 through March 15, 2023, a period of 196 days (R4, tab 6 at 180).

The Solicitation mistakenly stated that "[t]he 9 Foot Channel was last dredged in 2011 and has experienced considerable shoaling since that time" (*id.* at 182). In fact, the 15-foot entrance channel, not the nine-foot channel, had been dredged in 2011 and had experienced "significant shoaling" since then (app. supp. R4, tab 7 at 744; app. br., ex. 1, Sprague depo tr. at 38-39).

The Solicitation, after being initially issued in 2021 and then cancelled, was reissued on May 20, 2022, with sealed offers due by June 21, 2022. (App. supp. R4, tabs 15 at 1145; 20 at 1636) USACE understood and intended that bidders would rely on the Solicitation's description of sea conditions in preparing their bids (app. br., ex. 6, Bradley depo tr. at 50:12-14; ex. 1, Sprague depo tr. at 69:5-13).

## II.    Information Known to USACE But Not Disclosed

USACE had additional information about the conditions at the 15-foot channel that it did not disclose in connection with the Solicitation. The parties dispute whether disclosure was required.

### A.  The 2010 Solicitation

The 15-foot channel at Newburyport was last dredged in 2010, under a contract solicited and awarded by the same USACE office (app. supp. R4, tab 7 at 744). The solicitation for that contract (the 2010 Solicitation) had stated that "[a]bout six days per month during the dredging window, seas can be expected to be in excess of eight feet in the river mouth." (App. supp. R4, tab 1 at 178) The dredging window extended from September 1, 2010 to March 31, 2011, roughly the same months as in the Solicitation (app. supp. R4, tab 1 at 89, 104).

The 2010 Solicitation had further stated:

> Due to the hazardous nature of the area of dredging, the vessels will need a certification, provided by an accredited marine surveyor, that certifies that the dredge/vessel can operate for its intended purpose in the sea state, current and surf conditions that exist in and around the opening of the Merrimack River and Atlantic Ocean, and insurance coverage for the classification "oceans" route.

(App. supp. R4, tab 2 at 375 (cleaned up))

5

The 2010 Solicitation incorporated a Power Point presentation and transcript of a pre-bid conference held prior to bidding on the contract. The Power Point presentation included images of high sea swells and stated:

> ▪ Entrance channel can be very rough.
>
> ▪ We suggest contacting the local Coast Guard Station if you need additional information.
>
> ▪ Dredging Equipment needs to be qualified to work in the sea conditions expected in the entrance channel. (EM 385-1-1, 19.A.01 Floating plant inspection and certification)

(App. supp. R4, tab 1 at 106) The transcript reflects the following comments from USACE personnel:

> One thing we want to stress is that if you're not familiar with the channel here, it can be a very rough place to work. These are some pictures of the Coast Guard on a pretty bad day, but you may want to contact the local Coast Guard and talk to them about what conditions are or go up there and take a look yourself, but you do need to know that it's not a – going to be an easy place to work.
>
> The dredging equipment, we need to be sure that you can work there. We're not going – going to allow some equipment to work there that we don't think is going to be able to complete the work or do it without being safe. EM 385-1-1 covers floating plant and certification. That's going to be needed. Basically, we need to know that you're able to do the work without killing yourself or anyone else.

(*Id.* at 89-90)

Mr. Marcotte was responsible for preparing the specifications for the 2010 Solicitation (app. br., ex. 2 at 7, 12). Mr. Sprague reviewed the 2010 Solicitation while preparing the description of sea conditions at the 15-foot channel for the Solicitation (app. br., ex. 1, Sprague depo tr. at 49:25-50:12, 154:8-19). Mr. Sprague was aware that it is normal for swells in the 15-foot channel to exceed eight feet approximately six days per month (*id.* at 49:25-50:12, 154:8-19). He understood that the sea conditions remained consistent between 2010 and 2022 (*id.* at 49:14-18).

USACE chose not to include in the Solicitation the explicit warnings about the conditions at the entrance channel that it had emphasized in the 2010 Solicitation. Consequently, the Solicitation did not state that seas at the 15-foot channel could be "very rough" and exceed eight feet about six days per month, that the local Coast Guard station had additional information, or that the hazardous conditions warranted special requirements to ensure the selected dredge could safely and effectively operate there.

H&L was unaware of the warnings and dredge requirements in the 2010 Solicitation when it bid on the Solicitation, and no evidence suggests the 2010 Solicitation was accessible to H&L at that time (app. br., ex. 3, Haney aff. ¶¶ 16-17).

B.  The Section 204 Report

In 2020, USACE conducted a study to determine the feasibility of placing material dredged from the Newburyport Harbor entrance channel onto a nearby island (app. br., ex. 1, Sprague depo tr. at 90:12-23).  Mr. Sprague, who later drafted the description of sea conditions at the entrance channel for the Solicitation, was among the USACE employees who conducted the study (*id*. at 90:1-4).  The study culminated in the Section 204 Beneficial Use of Dredged Material from Federal Navigation Project Maintenance Detailed Project Report and Environmental Assessment (the "Section 204 Report"), dated January 2021 (*see* app. supp. R4, tab 4).

The Section 204 Report noted that the Newburyport Harbor entrance channel was last dredged in 2010 by the *Dredge Illinois*, which was certified for ocean work as required by the 2010 Solicitation.  Before that, according to the report, the channel had been dredged by mid-size hopper dredges, dating back to 1961.  (App. supp. R4, tab 4 at 699, 714; app. br., ex. 1, Sprague depo tr. at 154:15-18)

Generally, hopper dredges operate more effectively in rough conditions than cutterhead dredges.  Cutterhead pipeline dredges use a cutterhead to disturb the channel floor and then draw material up an intake pipe and propel it through a discharge pipeline to a disposal site.  Because the discharge pipeline is floated on the water's surface, cutterhead pipeline dredges are ill-suited for work in rough seas. Hopper dredges, conversely, have large containment areas, or "hoppers", where material is stored until the dredge is moved to a disposal area.  As hopper dredges do not rely on a discharge pipe, they can maintain operations in relatively rough seas. (App. supp. R4, tab 32, 1914-15; app. br., ex. 1, Sprague depo tr. at 132:3-19)

The Section 204 Report stated that "[t]he recent condition survey results show that the entrance inner harbor channels have shoaled to depths impeding safe navigation . . . ." (app. supp. R4, tab 4 at 709).  The report further found that the "shoals present a

7

hazard to navigation and under certain tidal conditions, seas become violent in the entrance channel. Under these conditions, vessels using the harbor are subject to unsafe conditions which may result in hazardous situations and damages. Dredging will restore navigability to the channel and alleviate these potentially hazardous conditions." (*Id.* at 716) The Section 204 Report also found that, absent dredging of the 15-foot channel, "[h]azardous sea conditions near the shoaled areas will continue to cause unsafe conditions and endanger small craft" (*id.* at 721-22). Mr. Sprague testified that the "violent" and "unsafe" conditions referenced in the Section 204 Report are large swells (app. br., ex. 1, Sprague depo tr. at 97:14-23).

The Solicitation did not inform bidders that all dredging of the 15-foot channel before 2010 had been performed by hopper dredges and that, since then, the increased shoaling there had caused violent seas and hazardous and unsafe conditions characterized by high sea swells.

The government does not assert that the Section 204 report was publicly available at the time H&L was preparing its bid.

C. The Basis of Design

Before issuing the Solicitation, USACE had computed the "average northeastern significant wave height at the [Newburyport] harbor entrance" to be 3.8 feet. The 3.8-foot average was included in a "Coastal Engineering" analysis of conditions potentially impacting dredging in Newburyport Harbor, which was appended to the "Basis of Design" prepared in connection with the Solicitation. (App. supp R4, tab 14 at 1109-10) The Basis of Design is an internal USACE document that records the assumptions and conditions underlying the Solicitation (app. br., ex. 6, Bradley depo tr. at 99:3-22).

USACE calculated the 3.8-foot average based on "the full record of hindcast wave data at the nearest USACE Wave Information Study (WIS) location (Station 63045)" (app. supp. R4, tab 14 at 1109). This record covered the 34-year period from January 1, 1980 through December 31, 2014, and provided "hourly hindcast wave parameters including significant wave height, peak period, and direction" (*id.* at 1110). USACE extracted the data for "waves traveling from the northeastern direction" and determined the average wave height at the referenced station. Because the water at that station is deeper than at the harbor entrance, USACE performed a "shoaling analysis" to estimate northeastern wave conditions at the harbor entrance. Using the USACE Automated Coastal Engineering System "to apply linear wave theory for wave transformation from deep to intermediate water depth," and making certain assumptions, "the long-term average northeastern significant wave height at the harbor entrance was thus computed to be 3.8 feet." (*Id.*)

The Coastal Engineering analysis makes clear that the computation of the 3.8-foot average height was only for waves approaching from the northeast. Data relating to waves coming from other directions was available but was excluded from the analysis. Consequently, the report does not compute wave heights from directions other than northeast, although USACE apparently had the data to do so. (*Id.*) It appears that USACE could have used the complete data and its Automated Coastal Engineering System to compute the average wave height at the Newburyport Harbor entrance regardless of wave direction but did not.

USACE employees involved in preparing the Solicitation were aware of the Basis of Design and its calculation of the 3.8-foot average northeastern wave height (*see* app. supp. R4, tab 14 at 1110, tab 15 at 1145). The Solicitation did not disclose this finding, and no evidence suggests that it or the underlying data was publicly available.

## III. The Independent Government Estimate

USACE prepared an Independent Government Estimate ("IGE") for the 15-foot channel portions of the 2022 Newburyport dredging contract (app. supp. R4, tab 20 at 1628-29). The IGE was prepared by USACE engineering personnel who were not part of the project team. The purpose of the IGE was to generate a bid that would be representative of a reasonable bid. (App. br., ex. 6, Bradley depo tr., at 77:1-7, 77: 16-21) Consequently, the IGE was prepared using only the Solicitation and information available to bidders (*id.* at 80:3-14).

The IGE, which was not made available to bidders, estimated a fair and reasonable bid for the contract to be $7,069,095.81, of which $5,563,720.14 was for the 15-foot channel work and $1,505,375.67 for the nine-foot channel work (app. supp. R4, tab 20 at 1629-30). The IGE assumed that waves over three feet in the 15-foot channel would cause "non-effective work time" and "possible delay days" (app. supp. R4, tab 19 at 1579, indicating that it anticipated the contractor would use a dredge that could not operate in swells over three feet). It estimated that waves at the entrance channel would exceed three feet 47 days per year, an average of roughly four days per month. For the months of October through March, the IGE estimated waves greater than three feet would occur one to three days per month, or approximately 10% of the time. (*Id.*)

Based on these and other assumptions, the IGE anticipated that the dredging contractor would use a 14-inch cutter suction dredge[2] and anticipated a construction

---

[2] Cutterhead dredges are often referred to by the size of their intake pipes. A larger intake pipe corresponds to a larger dredge that can dredge material at a faster rate and withstand greater waves and swells (app. br., ex. 3, Haney aff. ¶ 3).

duration of approximately 4.3 months (app. supp. R4, tab 19 at 1574, tab 20 at 1634; app. br., ex. 6, Bradley depo tr. at 85:10-19).

The IGE posited that a 14-inch dredge would be sufficient, even though it, like the *Oyster Bay,* could be unable to work when swells exceed three feet.

## IV.   H&L's Bid and Plan for the Work

H&L timely submitted its bid on June 23, 2022, proposing a total price of $8,716,000, of which $7,770,000 was for performing the work related to the 15-foot channel and $946,000 for the work on the nine-foot channel (app. supp. R4, tab 20 at 1637-38).  As stated above, the IGE found $5,563,720.14 to be a fair and reasonable amount for the 15-foot channel portion of the work.

H&L's bid was prepared by its Managing Member, Mr. Keith Haney (app. br., ex. 3, Haney aff. ¶¶ 1, 8).  In preparing H&L's bid, Mr. Haney relied on the information regarding sea conditions in the Solicitation (*id.* ¶ 9).  Mr. Haney had some familiarity with Newburyport Harbor, having visited and observed the entrance channel on two occasions (*id.* ¶ 11; app. br., ex. 4, Haney depo tr. at 33:4-9, 34:2-21).  He was also aware that H&L had, on multiple prior occasions, towed a 16-inch dredge near the mouth of the entrance channel without incident (app. br., ex. 3, Haney aff. ¶ 12; ex. 4, Haney depo tr. at 32:19-33:9, 107:21-108:5).

USACE held a site visit for potential bidders on June 2, 2022, which no one from H&L attended (R4, tabs 4 at 127; 37 at 711-14; unnumbered tab at 996-97).  H&L had previously performed the Hampton Harbor dredging project and Mr. Haney recognized the similarity between the solicitation descriptions of the sea conditions at Hampton Harbor and Newburyport 15-foot channel (app. br., ex. 3, Haney aff. ¶¶ 5-6, 9-10; ex. 4, Haney depo tr. at 32:19-33:9).  Because of this similarity, Mr. Haney assumed that the entrance channel conditions at Newburyport would be comparable to those at Hampton Harbor (*id.*, ex. 3, Haney aff. ¶ 10; ex. 4, Haney depo tr. at 32:19-33:9, 44:15-45:20, 93:18 -94:9).  Like the Solicitation, the Hampton Harbor dredging was permitted from October 1, 2019 through March 15, 2020 (app. supp. R4, tab 3 at 400).  For the Hampton Harbor project, H&L had successfully used a 16-inch cutterhead dredge (app. br., ex. 3, Haney aff. ¶¶ 3, 7).

Based on the information before him, Mr. Haney concluded that swells in the 15-foot channel under normal conditions during the permitted dredging season would range between two and four feet, with swells occasionally exceeding four feet.  He also concluded that the 15-foot channel would experience some days of good weather, where swells would be between one and two feet.  (App. br., ex. 3, Haney aff. ¶ 13; ex. 4, Haney depo tr. at 54:10-18)

10

Mr. Haney selected the hydraulic cutterhead pipeline dredge *Oyster Bay* to dredge the 15-foot channel (app. br., ex. 3, Haney aff. ¶ 14).[3] The *Oyster Bay*, a 20-inch dredge, can comfortably dredge in swells up to three feet. Dredging must cease when swells exceed three feet, although the dredge can remain moored at its location. When swells reach or exceed five feet, the *Oyster Bay* must return to shore and, when conditions subside, be towed back to the site, its pipeline reconnected, and the associated land work re-established. This remobilization process requires approximately 48 hours. (App. br., ex. 3, Haney aff. ¶¶ 3-4; ex. 5, Coward depo tr. at 94:6 – 95:6, 100:6-13)

Recognizing that the Hampton Solicitation had said swells were "2-4 feet" while the Solicitation said "2-4 feet or more," Mr. Haney selected a larger dredge than he had for the Hampton Harbor project. The dredge that H&L had previously towed past Newburyport Harbor without incident had a 16-inch "freeboard" –the height of the hull above the waterline– and could only transit the mouth of the entrance channel if sustained swells were no more than one to two feet (app. br., ex. 3, Haney aff. ¶ 12; ex. 4, Haney depo tr. at 32:19-33:9, 107:21 – 108:5; ex. 5, Coward depo tr. at 30:3-8). H&L's selection of the *Oyster Bay* for the 15-foot channel project indicates that H&L believed swells would remain at or below three feet for enough days during the 196-day dredging period to complete the work. H&L understood, however, that swells over three feet would occur (*see* app. br., ex. 3, Haney aff. ¶ 13; R4, tab 38 at 102:5-8). H&L's schedule for dredging the 15-foot channel anticipated completing the work in 47 days, including 12 days of adverse weather days when dredging would be impossible (app. br., ex. 8, Johnson aff. ¶ 5; R4, tabs 9 at 244; 17 at 255). This assessment, which anticipated that adverse conditions would prevent dredging approximately 25.5% of the time, was less optimistic than the IGE, which assumed that waves over three feet would occur only 10% of the time during the relevant months.

In response to a post-bid question from USACE about its bid, H&L advised USACE that it intended to use pipeline hydraulic cutterhead dredges in both channels. Another H&L response to a USACE question referenced its completion of the

---

[3] The contract specifications did not dictate what equipment the contractor must use. Rather, they required the contractor to "[p]rovide the necessary plant and equipment to complete the project within the contract duration . . . ." (R4, tab 6 at 214) The contractor would be required to "keep on the job sufficient plant and equipment to meet the requirements of the work. The plant and equipment shall be in satisfactory operating condition and be capable of safely and efficiently performing the work. The plant and equipment shall be subject to inspection by the Contracting Officer and/or his representative at all times." (*Id*. at 192)

Hampton Harbor dredging project, characterizing it as "similar" to the Newburyport project. (App. supp. R4, tab 21 at 1721, 1723; app. br., ex. 4, Haney depo tr. at 44: 15-45:20)

## V.     Publicly Available Information

As noted above, H&L did not attend the site visit held by USACE on June 22, 2022. We find that such a visit on a single day in June would have provided minimal insight into the typical sea conditions during the winter months at the Newburyport entrance channel. The record is silent as to the sea state on the day of the site visit, but sea conditions tend to be worse in the winter months than in the summer (R4, tab 26 at 282). Regardless of the conditions on that particular day, observing them would not have informed a bidder about the sea conditions to expect over the 196-day dredging window.

The government asserts that H&L could have questioned USACE personnel at the site visit, but points to no evidence of what information was actually conveyed to attendees or what answers would have been given if questions were asked. In the absence of any evidence to the contrary, we find that H&L would not have learned from the site visit the information about entrance channel conditions that USACE possessed but omitted from the Solicitation.

The government further contends that the information H&L lacked was publicly available on third-party websites. In support of this contention, the government submitted declarations stating that the National Oceanic and Atmospheric Administration (NOAA) publishes information on its website related to wave heights, wind speed, and wind direction dating back to 1980. These declarations, from Melinda Bailey, Paul Hogg, and Timothy Chase, assert that this publicly available information included historical data for "the Merrimack River at Newburyport" that was accessible in 2021 and 2022 (R4, tab 30, Bailey decl. ¶¶ 3-4, tab 31, Hogg decl. ¶ 7, tab 32, Chase decl. at 3-5). The declarations also state that the NOAA website includes data, typically including sea swells and wave heights, from moored buoys and coastal fixed platform stations deployed by the National Data Buoy Center (R4, tab 30, Bailey decl. ¶ 4, tab 31, Hogg decl. ¶ 6, tab 32, Chase decl. at 4).[4] Notably, however,

_____

[4] The declarations also refer to Coastal Waters Forecast information provided online by the National Weather Service (R4, tab 30, Bailey decl. ¶ 4, tab 31, Hogg decl. ¶ 5, tab 32, Chase decl. at 3-4). However, the declarations provide no basis to conclude that this information, which appears to be limited to forecasts of upcoming conditions, would have been of any use to a bidder attempting to ascertain typical sea conditions at the entrance channel during the winter months.

the declarations do not include any of the specific wave height data that the declarants claim H&L could have found on the NOAA website, nor did the government otherwise provide that data.

Messrs. Hogg and Chase further declared that, had they been asked, they would have directed any inquiring bidder to publicly available official sources of information, such as the NOAA website (R4, tab 31, Hogg decl. ¶ 6, tab 33, Chase decl. at 3-4). Again, however, the government provides no evidence of what specific information those sources would have revealed regarding sea conditions at the 15-foot channel.

In its opposition brief, H&L argues that the government's declarations should be disregarded because they fail to provide the historical information they claim was publicly available, fail to describe how that information could be accessed, and are therefore conclusory and lacking in specific factual support. H&L further challenges Ms. Bailey's declaration, noting that she did not join the National Weather Service until after H&L had submitted its bid. H&L also submitted evidence demonstrating that the nearest NDBC buoy to Newburyport Harbor is located many miles away (app. opp'n br. at 30; *id.*, ex. 13)), that the Coastal Forecast information is not specific to the Newburyport entrance channel, and that searches run on NOAA's website for relevant terms either returned no results or information unrelated to sea conditions (*id.*, exs. 14-16). The government's reply brief did not address any of H&L's evidence or arguments disputing the contention that H&L could have learned the withheld information from publicly available websites.[5]

Consequently, we lack specific evidence demonstrating what a bidder could have learned from the NOAA website, or any other publicly accessible data, regarding wave heights at the specific location of the Newburyport Harbor entrance channel during May and June 2022. The evidence submitted by H&L casts doubt on the government's contention that wave heights at that location were readily ascertainable from publicly available information.

_____

Mr. Hogg also refers to an "app" called Windfinder Plum Island that he uses for "a quick or on-the-spot answer as to [sea] conditions" (R4, tab 31, Hogg decl. ¶ 6). H&L submitted evidence that the Windfinder website contains current "wind & weather statistics" for Plum Island and the Merrimack River Entrance, but states that "[n]o statistical weather data [is] available for this spot" (app. opp'n br., ex. 17). Again, we are unable to conclude that this resource would have provided bidders with useful information regarding typical sea swells at the Newburyport entrance channel during the relevant period.

[5] H&L moved for the admission into evidence of the exhibits to its opposition brief, pursuant to Board Rule 11(a) (app. opp'n br. at 6 n.3). The government did not object. We accept them into evidence.

Other circumstantial evidence magnifies this doubt. If the typical wave heights at the Newburyport entrance channel were readily ascertainable from public data, USACE would likely have relied on that data when computing the average wave height for the Coastal Engineering appendix to the Basis of Design. Instead, USACE utilized data from its WIS location Station 63045, not from any of the public sources now cited by the government (app. supp. R4, tab 14 at 1110). Moreover, the Station 63045 data was not specific to the entrance channel, necessitating an analysis using USACE's Automated Coastal Engineering System to extrapolate wave heights at the harbor entrance. This entire process would have been unnecessary if wave heights at the entrance channel could have been determined by simply consulting publicly available data.

Similarly, the USACE team that prepared the IGE would likely have consulted NOAA or other public data when estimating the working days that would be lost due to high sea swell at the Newburyport Harbor entrance. The record contains no evidence that they did so, and their ultimate selection of a dredge incapable of operating when seas exceeded three feet suggests that any information they may have obtained by doing so was inaccurate. Based on this record, we find that any publicly available data regarding wave heights in the general Newburyport area would not have informed H&L of the site-specific information withheld by USACE.

## VI.    The Contract

H&L was awarded Contract No. W912WJ22C0012 on July 28, 2022 (R4, tab 4 at 125). The contract required completion of the work in the 15-foot channel by March 15, 2023 (R4, tab 6 at 180).

The contract permitted the contractor to perform work 24 hours per day, seven days per week, including holidays, for the entire contract performance period (R4, tab 6 at 184). The contract further required the contractor to diligently prosecute the work and maintain a production rate of at least 75,000 cubic yards for a consecutive 30-calendar-day period (*id*. at 186).

## VII.   H&L's Contract Performance

H&L received notice to proceed on August 11, 2022 (R4, tab 5 at 171). H&L's initial, approved project schedule indicated that the *Oyster Bay* would be mobilized from New York to the site in late September 2022, with dredging commencing on October 3, 2022, and concluding by December 11, 2022. H&L anticipated a dredging duration of 47 days, including 12 days during which adverse conditions were expected to preclude dredging. (R4, tab 9 at 243-44)

14

On September 26, 2022, while the *Oyster Bay* was still in New York, USACE inspected the dredge and identified several deficiencies requiring correction (R4, tab 14 at 250, tab 32, Pickering decl. ¶¶ 1, 5). H&L worked on correcting the deficiencies and brought the *Oyster Bay* to Newburyport on November 24, 2022 (R4, tab 35 at 640).

On December 6, 2022, H&L informed USACE that it was unable to start dredging the 15-foot channel due to forecasted northerly/northeasterly winds and was temporarily reassigning personnel to other projects unaffected by those winds. H&L expressed hope to commence dredging of the 15-foot channel within "a couple of weeks" and to complete the work by late January or early February. (R4, tab 17 at 255) On December 15, 2022, USACE requested a project update, to which H&L's Project Manager responded that H&L expected to resume dredging "around the 2nd week in January" (R4, tab 18 at 256).

Meanwhile, further inspections of the *Oyster Bay* on November 28, 2022, December 5, 2022, and January 13, 2023 identified additional deficiencies and found that some previously identified deficiencies had not been fully corrected (R4, tab 32 ¶¶ 6-9). The evidence indicates that all deficiencies were resolved by January 28, 2023 (R4, tab 35 at 851).

On January 30, 2023, H&L tried to begin dredging the 15-foot channel. However, the *Oyster Bay's* cutterhead detached while setting anchors and needed to be replaced. After delays in retrieving the cutterhead due to large sea swells, H&L replaced it on February 2, 2023. (R4, tab 35 at 858, 862-67)

That same day, H&L requested that USACE extend the environmental dredging window and the contract completion date from March 15, 2023, to April 15, 2023, citing unexpectedly large sea swells at the 15-foot channel since early December. H&L posited that the unexpected wave heights resulted from unusual wind directions for that time of year. H&L formally requested that the dredging period for the 15-foot channel be extended to April 15, 2023, and that a corresponding modification be made to the environmental permit authorizing H&L's work. (R4, tab 20 at 260-61)

Before USACE responded to H&L's request for an extension, H&L informed USACE in mid-February 2023 that it had determined that conditions in the entrance channel precluded dredging by the *Oyster Bay*. H&L asserted that "sea state conditions from early December 2022 through today have made it impossible to perform the dredging work in the 15-foot channel" and that it would be "unsafe and unwise" to continue waiting for conditions to improve sufficiently for the *Oyster Bay* to complete the dredging. H&L advised USACE that an "ocean-going" dredge would be required and that H&L was in the process of subcontracting with Norfolk Dredging Co. to provide a dredge that would mobilize to the entrance channel by mid-March.

15

H&L further informed USACE that it believed the unexpected conditions, which it characterized as "not as represented in the bid documents," constituted a differing site condition and that H&L would seek compensation for its additional costs and a time extension (R4, tab 21 at 266-68).

The record contains no evidence that earlier correction of the deficiencies would have enabled H&L to commence dredging of the 15-foot channel sooner. When H&L informed USACE that it was being delayed by sea conditions, USACE neither disagreed with that assertion nor contended that the deficiencies were the primary factor in the delays. Instead, in early March, USACE approved an extension until April 30, 2023, and obtained environmental approval to continue entrance channel dredging through that date (app. supp. R4, tab 28 at 1891, tab 31 at 1898, 1903).

Norfolk Dredging Co. provided a 30-inch dredge, the *Delaware*, which mobilized to Newburyport Harbor in March 2023 (app. br., ex. 3, Haney aff. ¶¶ 19-21; ex. 4, Haney depo tr. at 89:10-21). On March 27, 2023, the *Delaware* began dredging in the 15-foot channel and completed the dredging in April 2023 (app. br., ex. 3, Haney aff. ¶ 21).

## VIII. Sea Conditions During Performance

The record before us lacks definitive data on the actual day-to-day sea conditions at the 15-foot channel from December 2022 (when the *Oyster Bay* was at the site) to March 2, 2023 (when it was demobilized). For December 2022 through January 2023, the evidence of the actual sea conditions consists of H&L's contemporaneous correspondence with USACE, as well as affidavits and deposition testimony of H&L personnel. In that correspondence, H&L repeatedly asserted that sea conditions precluded dredging in the 15-foot channel throughout December 2022 and January 2023. (R4, tab 17 at 255, tab 20 at 260-61, tab 21 at 266-68). USACE did not express disagreement with H&L's assessment of the sea conditions.

Mr. Haney's affidavit states that "[t]he *Oyster Bay* was unable to complete dredging in the 15' channel due to swells that were regularly in excess of 4', and numerous days where swells within the entrance channel were 6' to 8', or more" (app. br., ex. 3, Haney aff. ¶ 18). H&L's Project Superintendent's affidavit states that, during the period the *Oyster Bay* was at the site, he "regularly observed swells in excess of four feet (4') in the Newburyport Harbor entrance channel, including numerous days where swells within the entrance channel were 6' to 8', or more" (app. br., ex. 8, Johnson aff. ¶ 7; ex. 3, Haney aff. ¶ 18; *see also id.*, ex. 9, Coward aff. ¶ 3 (H&L Project Manager stating sea swell size during this period prevented *Oyster Bay* from dredging)).

16

Lacking any contrary evidence, we credit the statements in the correspondence and affidavits and find that, throughout December 2022 and January 2023, H&L regularly encountered sea swells of four feet or more in the entrance channel and that the swell size prevented the *Oyster Bay* from dredging during that period.

For the period from February 1, 2023 until March 2, 2023 (when the *Oyster Bay* was demobilized), the best evidence of the sea conditions is H&L's daily Quality Control Reports (QC Reports). During that 29-day period, the QC Reports indicate that H&L encountered swells that reached eight feet or more on four days (R4, tab 35 at 882, 930, 945, 948). Swells reached five feet or greater on 16 days (*id.* at 870, 873, 879, 882, 885, 891, 894, 900, 903, 906, 912, 915, 930, 933, 945, 948). While there were eight days when swells were reported to be three feet throughout the day (*id.* at 909, 918, 921, 924, 927, 936, 939, 942), there were no days where swells were reported to be less than three feet throughout the day. On one day (February 2) swells ranged from two to three feet (*id.* at 867). There were no days of the one- to two-foot swells that the solicitation indicated would be present under "good weather conditions."

## IX.    Procedural History

H&L submitted a certified claim to USACE's contracting officer on May 17, 2023, seeking "additional costs and time incurred as a result of defective specifications, superior knowledge and, in the alternative, a mutual mistake of fact" (R4, tab 3 at 24-36). The contracting officer denied the claim in a final decision on July 31, 2023 (R4, tab 2 at 14-22). H&L timely appealed to the Board. On November 21, 2024, the Board denied the parties' cross-motions for summary judgment.

DECISION

## I.    Rule 11 standard

Board Rule 11 gives the parties the option of waiving their right to a hearing and instead submitting their appeal for a decision based on the written record, with the Board making fact findings as necessary. *Trade West Constr., Inc.*, ASBCA No. 61068, 22-1 BCA ¶ 38,214 at 185,596. The weight given to evidence in the record lies "within the discretion of the Board." Board Rule 11(d).

## II.    USACE Failed to Disclose Superior Knowledge

"The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v.*

17

*United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).  The doctrine generally applies where:

> (1)   a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*Id.* (citing *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)).

a.  USCAE Failed to Disclose Information About the 15-Foot Channel Vital to H&L's Performance

The first and fourth factors, taken together, require us to consider whether H&L has shown that the government possessed, but did not disclose, information vital to H&L's performance of the required dredging of the 15-foot channel at Newburyport. H&L has made that showing.

H&L's difficulty in performing stemmed from its decision to select a dredge, the *Oyster Bay*, that could only operate in seas of less than three feet.  H&L based this decision primarily on the Solicitation's representation that seas would be 1-2 feet in good conditions and "2-4 feet or more" in normal conditions.  H&L concluded that the 20-inch *Oyster Bay* would be adequate to complete the work within the dredging window permitted by the contract.  For this approach to succeed, there would need to be enough days in the 196-day dredging window with seas under three feet to allow the *Oyster Bay* to complete the work.

H&L's selection of the *Oyster Bay* was reasonable for at least two reasons. First, the IGE, using the same information, selected a 14-inch cutterhead dredge, which it assumed would be delayed by seas exceeding three feet.  Second, the description of sea conditions in the Solicitation closely resembled the description in the Hampton Harbor Solicitation, where H&L had successfully dredged in a similar time window using a dredge smaller than the *Oyster Bay*.

In these circumstances, the relevant question is whether USACE possessed undisclosed information that would have prevented a reasonable bidder from selecting a dredge capable of operating only in seas below three feet.  We answer in the affirmative.  No reasonable bidder would have proposed a dredge like the *Oyster Bay* had the Solicitation disclosed the same information and warnings about the

Newburyport entrance channel that USACE had included in the 2010 Solicitation and otherwise possessed.

In particular, the 2010 Solicitation's requirement that the dredge be specially certified by an accredited marine surveyor for the local conditions and insured for ocean routes—neither of which applied to the *Oyster Bay*—would have dictated the selection of a more robust dredge. Yet both H&L and the IGE preparers concluded, based on the available information, that a smaller cutterhead dredge not meeting these requirements would be sufficient. *Hardeman-Monier-Hutcherson v. United States,* 458 F.2d 1364, 1367-68, 1371-72 (Ct. Cl. 1972) (contractor entitled to recover where government withheld information that would have revealed to plaintiff that its assessment of likely downtime from sea conditions was too optimistic); *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963) (government liable where it knew that its specifications were susceptible to misleading reading).

In addition, the fact that swells could be expected to reach eight feet or more six times per month (about 20%), a detail disclosed in the 2010 Solicitation but omitted from the Solicitation, would likely have affected H&L's dredge selection. Had H&L known that eight-foot swells could be expected approximately 20% of the time, it would not have assumed that seas over three feet (the *Oyster Bay's* limit) would prevent dredging only approximately 25.5% of the time (12 of the days in its 45-day schedule). Similarly, the IGE preparers would not have assumed that swells over three feet would occur only about 10% of the time (three days per month) during the dredging window. Considering also the 2010 Solicitation's repeated emphatic warnings regarding the unusually difficult conditions at the site, there is little doubt that H&L would not have proposed using the *Oyster Bay* for the Newburyport project had the Solicitation contained the same information.[6]

In addition to the warnings and information contained in the 2010 Solicitation, USACE was aware, at the time it prepared the Solicitation, of the information contained in the Section 204 Report indicating that all dredging of the entrance

---

[6] The government contends that the 2010 Solicitation's statement regarding eight-foot swells pertained only to the "river mouth," an area it claims was not required to be dredged in 2022, as it had been in 2010. The sole evidentiary support for this contention is that the 2010 drawings depict the dredging occurring slightly further toward the harbor from the ocean than the 2022 drawings. (Gov't reply br. at 22-24) However, there is no support for the implicit assertion that only this small portion of the channel, and not the remainder of the channel in the area where the river meets the ocean, constitutes the "river mouth." Nor is there any evidence suggesting that waves are larger in that small section than in the rest of the entrance channel. We therefore reject the government's contention.

channel at Newburyport prior to 2010 had been completed by hopper dredges, which generally operate more effectively in rougher seas than a cutterhead dredge like the *Oyster Bay*. Combined with the fact, also known to USACE from the Section 204 Report, that shoaling had worsened the sea conditions at the entrance channel since 2011, this historical information likely would have altered H&L's assessment of the *Oyster Bay's* suitability for this project had it been disclosed.

USACE also knew but did not disclose that it had conducted an analysis computing the "average northeastern significant wave height at the [Newburyport] harbor entrance" to be 3.8 feet. While this average, limited to waves from the northeast, may not, by itself, constitute vital information, it does incrementally add to the body of information USACE possessed, which, taken as a whole, amounted to vital information, even if individual pieces of it did not. The fact that the average northeastern wave height was 3.8 feet would suggest to a reasonable bidder that waves would exceed three feet significantly more than 50% of the time, at least when originating from that direction. Moreover, USACE evidently had access to data that would have allowed it to use the same method to compute wave heights from all directions, but chose not to do so and did not share that information with bidders. The government does not assert that any of this information was publicly available.

The government's argument that none of the undisclosed facts in its possession were vital is unpersuasive. The government contends that, because H&L knew that the 15-foot channel extended from the mouth of the harbor into the ocean, it knew or should have known that a dredge capable of operating in the ocean was necessary. While true, this argument misses the thrust of H&L's contention—that it would not have selected the *Oyster Bay* (which can operate in the ocean in seas up to three feet) had it known that USACE had previously insisted that the contractor use a dredge meeting special requirements (that the *Oyster Bay* did not meet) due to the rough sea conditions there. Indeed, those conditions had not improved and were likely worse. The vital information was not merely that some of the dredging would occur in the ocean; rather, it was that USACE considered this particular area of the ocean to be so rough that special restrictions on the types of dredges that could be used were required. There is no basis to conclude that this was no longer true in 2022. USACE, however, chose not to disclose it.

As H&L correctly points out, restrictions such as those included in the 2010 Solicitation limit competition and are therefore permissible under the Competition in Contracting Act only if they are "necessary to satisfy the needs of the agency or as authorized by law." 48 C.F.R. § 11.002(a)(1)(ii); *see also* 48 C.F.R. § 14.101(a) (in sealed bidding, "[u]nnecessarily restrictive specifications or requirements that might unduly limit the number of bidders are prohibited."). USACE offers no persuasive justification for why information deemed necessary in 2010 to ensure selection of a suitable dredge was not equally vital for the same purpose in 2022. *Cf. Marine Indus.*

20

*Constr., LLC v. United States,* 158 Fed. Cl. 158, 195-96 (2022) (government impermissibly withheld vital knowledge where it failed to inform bidders that it had omitted from solicitation a required pipe size that it had included in prior solicitations as minimally sufficient).

The government also contends that none of this information was vital because it was consistent with what was disclosed regarding the entrance channel conditions in the Solicitation—that waves are one to two feet in good conditions and two to four feet "or more" in normal conditions—and consistent with H&L's ultimate experience at the site. However, this argument again misses the key point regarding the undisclosed information. The Solicitation's description of sea conditions, regardless of its accuracy, failed to effectively convey what USACE knew: that a dredge such as the *Oyster Bay* would be inadequate for the task. Instead, it implied that there would be significant periods of time when waves were under three feet: whenever weather conditions were "good" and during some significant portion of the time when weather conditions were "normal." This implication led both H&L and the USACE personnel who prepared the IGE to conclude that a dredge incapable of operating in seas exceeding three feet would be adequate.[7] *Cf. Am. Ordnance LLC,* ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,788-89 (government liable where bidder reasonably believed based on solicitation that it would not experience specific problems, but government knew otherwise based on information it did not disclose).

The fact that waves of eight feet or more could be expected approximately 20% of the time, coupled with the fact that the rough conditions there had previously prompted USACE to issue specific warnings and impose special restrictions on dredges, was vital information. This information would have been far more informative and useful to H&L in selecting a suitable dredge than the information actually included in the Solicitation.

Accordingly, H&L has established the first and fourth factors of a superior knowledge claim.

---

[7] The government heavily relies on the phrase "or more" to support its contentions that its description of sea conditions was "accurate" and "consistent with" H&L's experiences. However, the record demonstrates that the phrase "or more" was not added based on any actual information regarding conditions at the entrance channel. The purpose of adding that phrase was not to inform bidders, but to enable USACE to argue, as it does here, that unexpectedly heavy seas were "consistent with" the Solicitation's description.

b. USACE was aware H&L did not have the vital undisclosed information and had no reason to inquire about it

USACE was aware that a reasonable bidder was likely to mistakenly conclude that a dredge like the *Oyster Bay* would be adequate to timely dredge the 15-foot channel. First, the USACE team preparing the Solicitation knew that in 2010 USACE had concluded that conditions there required extensive warnings to the bidders and special restrictions on what dredges could be used. They knew that these warnings and restrictions were needed to ensure that a sufficiently robust dredge was chosen. Nothing in the record suggests that USACE concluded in the ensuing years that this information was no longer true or had become readily available to bidders.

Second, the USACE project team knew from the IGE that a reasonable bidder reviewing the Solicitation and other available information could incorrectly conclude that a dredge capable of operating only in seas up to three feet was adequate for dredging the 15-foot channel. The IGE, prepared by other USACE personnel with access only to the information available to bidders, concluded that seas under three feet would occur frequently enough that a 14-inch cutterhead dredge (smaller than the 20-inch *Oyster Bay*) would be sufficient.

Third, USACE knew that its description of sea conditions at Newburyport was based on and quite similar to its description of conditions at Hampton Harbor. The Hampton Harbor description had led the successful bidder (which happened to be H&L) to select a 16-inch cutterhead dredge for that project. While USACE added the words "or more" to the Solicitation, it could not reasonably have expected the addition of that phrase would adequately inform bidders familiar with the Hampton Harbor Solicitation that, despite the similar language, conditions at the Newburyport and Hampton Harbor entrances were so much worse that a 20-inch cutterhead like the *Oyster Bay* would be inadequate.

Accordingly, USACE knew that the information conveyed in the Solicitation did not convey to bidders the true nature of the conditions at the Newburyport entrance channel. *See Helene Curtis*, 312 F.2d at 778 (government liable where it knew that its specifications were susceptible to misleading reading); *Am. Ordnance LLC*, 10-1 BCA ¶ 34,386 at 169,788-89.

H&L had no reason to suspect that USACE actually believed that conditions at the Newburyport entrance channel were unusually severe enough to have warranted special warnings and dredge requirements the last time it had solicited bids to dredge that channel. H&L also had no reason to believe that USACE might know that swells at the entrance channel could be expected to reach eight feet or more six times per month or that USACE had internally calculated the average northeastern wave height at that location to be 3.8 feet, significantly higher than what the Solicitation implied.

22

Unlike in 2010, USACE had not encouraged bidders on the Solicitation to seek out additional information about the sea conditions from the Coast Guard. And the IGE showed that data disclosing the true conditions at the entrance channel was not readily available and that the Solicitation would not prompt a reasonable bidder to inquire further about sea conditions in preparing its bid. Accordingly, USACE was aware that H&L would have no reason to inquire into the additional information that USACE possessed but did not disclose.

c. The Solicitation misled H&L and did not put it on notice to inquire

For the reasons discussed above, the description of the sea conditions in the Solicitation and the absence of warnings and restrictions like those included in the 2010 Solicitation misled H&L into concluding that the *Oyster Bay* would be an adequate dredge for the 15-foot channel. Specifically, from the description of "good" and "normal" entrance channel conditions and the lack of contrary information, H&L reasonably concluded that days with waves under three feet would occur frequently enough that a cutterhead dredge that could operate only under those conditions could successfully dredge the channel in the time allowed. The close resemblance to the description of the Hampton Harbor conditions, even though conditions at Newburyport were significantly rougher than at Hampton Harbor, also contributed to the Solicitation being misleading. The information in the solicitation would not have alerted a bidder to expect what H&L experienced: insufficient days between December and March when the sea swell at the 15-foot channel was three feet or less.

The government's argument that H&L should have known that the sea swell would regularly exceed three feet during the dredging window and that a 20-inch cutterhead dredge limited to operating in waves three feet or less was inappropriate for the project is undermined by the IGE. For the reasons discussed above, the IGE shows that H&L's understanding of the sea conditions and expectations for potential adverse weather days, and thus its decision as to an appropriate dredge, were reasonable. USACE makes no effort to square its contention that H&L misunderstood the available information with the fact that its own IGE was based on similar and even more optimistic conclusions drawn from the same information.

The Solicitation also did not put H&L on notice to inquire further about the conditions at the entrance channel. The 2010 Solicitation had specifically invited bidders to contact the Coast Guard for additional information about the conditions there, but USACE omitted that information from the Solicitation.[8] And whereas the

---

[8] The Solicitation included contact information for the Newburyport harbormaster and U.S. Coast Guard, but in connection with certain post-contract responsibilities, not for further information about sea conditions (R4, tab 6 at 189).

Solicitation encouraged bidders to contact the National Weather Service about temperature and precipitation, it said nothing similar about wave height. *See Pitt-Des Moines, Inc.*, ASBCA No. 42838, 96-1 BCA ¶ 27,941 at 139,576 ("Where there is nothing in the solicitation documents that notifies potential offerors of the existence of useful information, or which creates an obligation to ask, an offeror is not required to seek out or consult non-contract documents to ferret out potentially useful information.").

The government argues that H&L's superior knowledge claim fails because H&L did not conduct an adequate pre-bid investigation as required by the Solicitation. It points to the Solicitation's disclaimers that the information provided is "for information only" and requirements that the contractor investigate and satisfy itself as to the site conditions, including "weather, river stages, tides, or similar physical conditions at the site . . . ." FAR 52.236-3(a). USACE faults H&L for not attending the site visit USACE held on June 2, 2022, otherwise investigating the site, reviewing data on publicly accessible websites and consulting with the Coast Guard and the Newburyport harbormaster.

General disclaimers are disfavored and do not absolve the government from its obligation to ensure that the factual representations made in solicitations are not inaccurate or materially misleading. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 995-96 (Fed. Cir. 2014); *Foster Constr. C. A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 887-88 (Ct. Cl. 1970); *Tetra Tech Facilities Constr., LLC*, ASBCA Nos. 58568, 58845, 16-1 BCA ¶ 36,562 at 178,090 ("The fact that representations as to subsurface conditions are labeled as 'for information only' or that the contract contains a requirement that the contractor perform further subsurface investigation after award does not deprive the contractor of the right to rely on the government's pre-contract representations."). Accordingly, H&L was entitled to rely on the Solicitation's representations about the sea conditions at the 15-foot channel.

Nonetheless, if a reasonable pre-bid investigation would have revealed the information H&L contends USACE should have disclosed, it cannot prevail on its superior knowledge claim. *See Sage Acquisitions LLC v. Sec'y of Hous. & Urb. Dev.*, 119 F.4th 973, 984 (Fed. Cir. 2024) (government not liable where alleged superior knowledge was "readily obtainable" by bidder before it entered into contract); *Giesler*, 232 F.3d at 877 (superior knowledge doctrine inapplicable where contractor could have "readily obtained" the undisclosed information); *ACC Constr. Co.,* ASBCA Nos. 62265, 62937, 22-1 BCA ¶ 38,194 at 185,481 (as a corollary to the superior knowledge rule, the government "is under no duty to volunteer information which the contractor can reasonably be expected to seek out himself[.]"). The failure to conduct a pre-bid investigation, however, does not defeat the claim if a reasonable investigation would not have revealed the withheld information. *See, e.g., Cent. Env't, Inc.*, ASBCA No. 62628, 24-1 BCA ¶ 38,488 at 187,082 (rejecting government

24

argument that contractor should have learned withheld information from public website where government failed to show consulting the website would have apprised the contractor of the information); *Atherton Constr., Inc.*, ASBCA No. 44293 *et al.*, 02-2 BCA ¶ 31,918 at 157,711 ("The duty of bidders to investigate the job site does not require them to conduct time-consuming or costly technical investigations to determine the accuracy of the Government's drawings or other indications in the solicitation documents.") (citing *Foster*, 435 F.2d at 888).

Attending the site visit, held on a single day in June, would not have informed H&L of the information the government was withholding about the conditions that the contractor could expect over a 196-day period from September to March. Conditions are typically rougher in the winter than in summer and, in any event, observation of the conditions on a single day is not a substitute for actual long-term data like that held by USACE.

As for the NOAA website data, the record does not reveal what specific information H&L could have learned from that data about sea swells at the entrance channel to Newburyport Harbor. As discussed above, we conclude, based on the evidence before us, that the NOAA data would not have been specific to the entrance channel, or at least not as specific to the channel as the information USACE possessed but did not disclose.

Accordingly, while we must ascribe to H&L the knowledge it would have obtained had it attended the site visit, otherwise inspected the site and consulted readily available information about sea conditions at the site, *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1346 (Fed. Cir. 1998) ( "[A] contractor is charged with knowledge of the conditions that a pre-bid site visit would have revealed"), here we find that the more robust investigation USACE contends H&L should have performed would not have revealed the information USACE possessed but did not disclose.

To conclude, we disagree with the government that H&L is ultimately at fault for the difficulties it had in dredging the entrance channel because it should have been more prudent in selecting a dredge for this work. The government ignores its own role in driving the dredge selection by holding back information that it had previously considered essential to prevent precisely this type of mistake.

It is true that H&L took a risk by selecting a dredge that could not operate in seas over three feet, anticipating based on the information at hand that there would be 35 days in the 196-day dredging window where the seas would be under three feet. Competitive bidding incentivizes this type of risk-taking, as the most prudent bidders, who price in all potential eventualities, generally do not win contracts. The government benefits from this risk-taking by getting the lowest price. At the same time, the government's fixed-price contracts generally protect it from the

consequences of over-optimistic assumptions, because the contractor bears the risk of higher than expected costs. The fairness of this arrangement, however, breaks down if the government knowingly withholds information crucial to a bidder's ability to assess the risks of its proposed course. The superior knowledge doctrine provides the contractor a remedy in this situation. *Hardeman-Monier-Hutcherson,* 458 F.2d at 1367-68; *Helene Curtis*, 312 F.2d at 778 ("Although it is not a fiduciary toward its contractors, the Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."); *Am. Ordnance LLC*, 10-1 BCA ¶ 34,386 at 169,790.

H&L has demonstrated entitlement on its superior knowledge claim.

## I. USACE Issued Defective Specifications

H&L also established entitlement on its defective specification claim, for essentially the same reasons it prevails on its superior knowledge claim.

The Federal Circuit has articulated the elements of a defective specifications claim:

> [W]here a contractor-claimant seeks to recover an equitable adjustment for additional work performed on account of a defective specification, the contractor-claimant must show that it was misled by the defect. To demonstrate that it was misled, the contractor-claimant must show both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance,—in other words, a patent defect—that would have made such reliance unreasonable.

*E.L Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed. Cir. 2004).

Here, the Solicitation's description of the sea condition was defective because its failure to include vital information known to USACE about those conditions rendered it affirmatively misleading. H&L relied on the misleading specification in formulating its bid and there is no suggestion that the defect was patent. H&L's reliance on the specification to conclude that the *Oyster Bay* would be an adequate dredge was reasonable, as demonstrated by the fact that USACE's IGE reached essentially the same conclusion based on the same information.

CONCLUSION

We sustain H&L's appeal as to entitlement.[9]  The issue of quantum is remanded to the parties for resolution.

Dated:  August 18, 2025

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63695, Appeal of H&L Contracting LLC, rendered in conformance with the Board's Charter.

Dated: August 18, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

---

[9] Because we find for H&L on its superior knowledge and defective specifications claims, we do not reach its alternative mutual mistake of fact claim.

27